JOHN A. KRAMER AND GLORIA L. KRAMER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3911–79.     Filed April 25, 1983.

---

*Mark Townsend*, for the petitioners.
*Karen J. Simonson*, for the respondent.

RAUM, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income taxes for 1975 and 1976 in the amounts of $15,752 and $23,088, respectively. The sole issue for decision is whether certain amounts received by petitioner John A. Kramer during those years constituted "earned income" for purposes of the maximum tax on earned income and the computation of the maximum deductible contribution to a self-employment pension (Keogh) plan.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners, husband and wife, resided in Los Angeles, Calif., at the time they filed their petition. Because Gloria L. Kramer is a petitioner only by virtue of having filed joint returns with her husband for 1975 and 1976, references hereinafter to "petitioner" will be to John A. Kramer.

John A. Kramer, better known as "Jack" Kramer, is a former U.S. tennis champion. His competitive career stretched from 1935 to 1960, first as an amateur and then, beginning in 1947, as a professional. In that same year, he entered into a 7-

year agreement with the Wilson Sporting Goods Co. (Wilson) pursuant to which Wilson was authorized to use his name, nickname, facsimile signature, initials, and/or portrait on tennis frames (racquets without strings), tennis balls, and other tennis equipment which it manufactured and sold.

This relationship has continued, apparently uninterrupted, at first through an extension of the 1947 contract and then by the execution of a substantially identical contract in 1959, which was also thereafter extended. The 1959 contract was the operative agreement between petitioner and Wilson during 1975 and 1976, and in relevant part it provided as follows:

WHEREAS, Wilson is engaged in the sale of tennis frames, tennis balls, and other tennis equipment and is desirous of acquiring the services of Kramer in promoting its sale of tennis frames, tennis balls, and other tennis equipment, the benefit of Kramer's technical knowledge and skill in designing such products; and the right and license to manufacture and/or sell and distribute and advertise tennis frames, tennis balls, and other tennis equipment identified by the name, facsimile signature and/or portrait of Kramer, and/or any nickname which may be popularly applied to him;

 \*      \*      \*      \*      \*      \*      \*

1. Kramer shall, during the period of this agreement or any renewal thereof, use in play exclusively tennis frames, tennis balls, and other tennis equipment manufactured and/or sold and distributed by and bearing the trade mark of Wilson; and shall use his best efforts to promote and further the sale of such products. During the life of this agreement or any renewal thereof, Wilson shall have the right to use for advertising purposes the fact that Kramer uses in play exclusively Wilson's trade marked tennis frames, tennis balls, and other tennis equipment manufactured and/or sold and distributed by Wilson.

2. Kramer hereby gives and grants to Wilson the exclusive world rights and license to manufacture and/or advertise, sell and distribute tennis frames, tennis balls, and other tennis equipment identified by the name, facsimile signature, initials and/or portrait of Kramer, and/or any nickname which may be popularly applied to him. \* \* \*

 \*      \*      \*      \*      \*      \*      \*

5. It is mutually understood and agreed that Kramer will make appearances, including appearances at Wilson's dealers' stores, and will conduct clinics and exhibitions at the request of Wilson whenever it is consistent with the interests of both parties.

6. Wilson agrees to pay Kramer a royalty of two and one-half per cent (2½%) upon the net sales per annum of all tennis frames and tennis equipment bearing the name and/or names aforementioned, manufactured and/or sold and distributed during the term of this agreement by Wilson or any licensee of Wilson located in the United States of America and/or the Dominion of Canada. Wilson further agrees to pay Kramer a royalty of five

cents (5¢) per dozen on all sales of tennis balls bearing the name or names aforementioned, manufactured and/or sold and distributed during the term of this agreement by Wilson or any licensee of Wilson located in the United States and/or the Dominion of Canada.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The royalty payments above provided shall be in full compensation for all services performed by Kramer hereunder and for all rights granted by Kramer to Wilson hereunder.

7. The term of this agreement shall be the period commencing January 1, 1960, and ending December 31, 1965. Wilson shall have the option of renewing this agreement, upon the terms and conditions herein stated, for an additional period of three (3) or five (5) years from and after January 1, 1966, by giving Kramer thirty days notice in writing prior to said date of its intention so to do, provided, however, that in the event Wilson elects to exercise its said option to renew it shall not be required to pay Kramer any sums as an advance against royalties to be earned during said renewal period.

\*　　\*　　\*　　\*　　\*　　\*　　\*

8. It is understood and agreed that in the event of Kramer's death during the term of this agreement, or in the event that he shall become incapacitated, or for any other reason is unable to, or does not perform the services required to be performed by him hereunder, then and in such event Wilson shall have the right, at its option, to cancel and terminate this agreement by giving to Kramer or his personal representative sixty (60) days written notice of its intention so to do.

Wilson expected to receive from petitioner more than just the right to use his name, photograph, etc., because its approach to the use of a "name" tennis player as an aid in marketing tennis equipment sought to integrate the player into its overall promotional program. Thus, a player under contract to Wilson was considered to be "on call" to make public appearances on Wilson's behalf or participate in other promotional activities. For example, if Wilson desired petitioner's participation in a promotional event involving an important wholesale customer, it would check on his availability to attend the event and, assuming he were available, it then would coordinate a program of activities for him. These might include making public appearances, doing TV and radio interviews, participating in clinics for players and consumers, and coaching clinics for tennis teachers. In addition to these activities, petitioner assisted Wilson in other ways, such as testing racquets and balls for purposes of product development and quality control. Petitioner also appeared in print and television advertisements for Wilson. With the exception of

the television advertisements, for which Wilson was required by a television union contract to pay petitioner a "scale rate," petitioner was not separately compensated by Wilson (other than for his expenses) for any of the services described above; rather, his sole monetary benefit was the increased royalties from increased sales of the products identified with him.

Petitioner's tennis activities in 1975 and 1976 were not limited to those in which he was engaged on behalf of Wilson. Indeed, such activities to a substantial extent were not undertaken in response to the demands of the Wilson contract. They were conducted by petitioner with a view to keeping his name and reputation alive in the tennis world and maintaining the valuable goodwill associated with his name—goodwill that he could exploit not only indirectly with respect to the amount of royalties payable by Wilson but also in respect of profitable arrangements with other companies, as will hereinafter appear. His activities included active and prominent participation in a number of tennis organizations, notably the Association of Tennis Professionals (ATP), of which he was the executive director in 1975. Petitioner spent a great deal of time traveling in connection with tennis matters in each of the years in issue, as indicated by his travel calendars:

JACK KRAMER TRAVEL CALENDAR INVOLVING TENNIS

| Location | Event |
| --- | --- |
| 1975 | |
| Jan. 13–16: New York, Boston, Chicago | New York/Boston—Association Tennis Professionals Tournament business; Chicago re Wilson |
| Jan. 17–18: Palm Springs | American Airlines Tournament representative meeting |
| Jan. 20–24: Philadelphia | Tournament and Association Tennis Professionals meetings |
| Jan. 25–26: Las Vegas | Alan King Tennis Classic |
| Jan. 31 - Feb. 2: Palm Springs | Davis Cup |
| Feb. 6–9: Bermuda | Men's International Professional Tennis Council meetings |
| Feb. 14–17: Amelia Island | U.S. Tennis Association annual meeting, Wilson party and tennis event |
| Mar. 26: Tucson | American Airlines Tournament Draw |

| Location | Event |
|---|---|
| Apr. 1–7: Tucson | American Airlines Tournament |
| Apr. 15: Las Vegas | Meeting Alan King re Caesar's Palace Tournament |
| Apr. 19–20: Silver Lakes (near Victorville) | Tennis Clinic |
| May 3–4: Phoenix | Wilson promotion |
| May 10–11: Silver Lakes | Tennis Clinic |
| May 12–18: Las Vegas | Alan King Tennis Tournament at Caesar's Palace |
| May 28–31: Boston, Washington | Association Tennis Professionals Tournament meetings |
| June 21 - July 4: London | Wimbledon (2-week tournament) |
| July 8–12: New York | Tennis meetings |
| July 22: Houston | Tournament plans and Draw |
| July 27–31: Boston, Chicago | Association Tennis Professionals meeting in Boston; Wilson national sales meeting in Chicago |
| Aug. 6–9: Dallas, Cincinnati, Columbus | Advance Tournament promotion |
| Aug. 19 - Sept. 8: Boston, Forest Hills, Courtland, Dallas | Assocation Tennis Professionals meeting in Boston; Forest Hills Tournament; Wilson factory meeting in Courtland, N.Y.; Award Dinner in Dallas |
| Sept. ___: Los Angeles | Pacific Southwest Tennis Tournament |
| Sept. 26 - Oct. 6: Jamaica | Association Tennis Professionals Nation's Cup Tournament |
| Oct. 11: Reno | Visit to "Boys Home" |
| Oct. 17: Chicago | Wilson sales meeting |
| Oct. 29 - Nov. 4: Paris | Men's International Professional Tennis Council Tournament, scheduled meetings |
| Dec. 2–10: Stockholm, London | Men's International Professional Tennis Council meetings |

1976

| | |
|---|---|
| Jan. 13–14: Palm Springs | Toyota Clinic and Tournament |

| *Location* | *Event* |
|---|---|
| Jan. 16–19: Washington, D.C. | Touchdown Club Award—"Kramer for Athlete of the Century Representing Tennis," received award from President Ford |
| Feb. 10–16: Tampa, Florida; Washington, D.C. | Sarasota for U.S. Tennis Association annual meetings; Washington for sports group breakfast with President Ford |
| Feb. 20–23: Jacksonville, Florida | USTA meeting and Tournament Directors meetings |
| Mar. 7–15: London, Paris | Men's International Professional Tennis Council meetings |
| Mar. 16: Palm Springs | Preparatory for Tournament |
| Mar. 19–21: Las Vegas | Meetings re Alan King Tournament at Caesar's Palace |
| Mar. 23–28: Palm Springs | American Airlines Tournament; Wilson meeting Mar. 24 |
| Apr. 7–8: New York | New York Police Athletic League meeting |
| Apr. 10–16: London, Paris, Myorca [Mallorca?], London | Men's International Professional Tennis Council meetings; meetings to incorporate WCT into Grand Prix |
| Apr. 24–26: Silver Lakes | Tennis Clinic |
| May 10–16: Las Vegas | Alan King Tennis Classic at Caesar's Palace |
| May 27–31: Houston, Corpus Christi | Lloyd Bridges Tournament; NCAA finals |
| June 15 - July 6: Paris, London | Men's International Professional Tennis Council meetings; Wimbledon Tournament; meetings w/Wilson British subsidiary |
| July 21–22: Chicago | Wilson sales meetings |
| July 26: San Diego | Wilson meeting |
| Aug. 7: Los Angeles | ARCO Tennis Clinic |
| Aug. 13–15: Indianapolis | Tennis Clinic |
| Sept. 1–14: New York, Dallas | IPTC meetings and Forest Hills Tournament; JAKS award banquet in Dallas for Cystic Fibrosis (professional tennis association charity) |
| Sept. 15: Dallas | Doubles Tennis Tournament |

| Location | Event |
|---|---|
| Sept. ___: Los Angeles | Pacific Southwest Tennis Tournament |
| Sept. 23–24: Chicago | Tennis Clinics |
| Oct. 2–5: Palm Springs | Wilson sales meeting; Tennis Clinic |
| Oct. 19–29: Houston, Washington, Paris, London | Masters Tournament; IPTC meetings; Lawn Tennis Education meeting |
| Nov. 10–15: Chicago, New York, Puerto Rico | Tournament Directors meeting in Chicago; Almaden Grand Masters Tournament in Puerto Rico |
| Dec. 5–15: Houston, Washington | Masters Tournament in Houston; Washington Tennis Patrons Award to Jack Kramer |

As may be seen from these calendars, the bulk of petitioner's tennis-related travel was not directly connected with Wilson, or apparently requested by it in accordance with paragraph 5 of the contract, notwithstanding that Wilson benefited therefrom. Wilson was pleased to have petitioner engage in such activities since it could anticipate that its sales of the "Jack Kramer" racquet would be favorably affected by petitioner's constant efforts to maintain or even enhance the goodwill associated with his name. However, petitioner's name and reputation represented an intangible asset that was valuable to him wholly apart from his relationship with Wilson. It was an asset that petitioner could exploit in respect of sales of tennis racquets and other equipment in the event that his connection with Wilson should terminate for any reason, and it was an asset that he could exploit in connection with other business ventures. Thus, because petitioner was "sort of the custodian of the Davis Cup" for 3 years, a company identified as Congoleum "sponsored the team" and sent petitioner around the country, displaying the cup in public places and tennis clubs, and talking with sports reporters with the cup in view. The record also contains evidence of a tennis tournament run by petitioner that was sponsored by American Airlines. In addition, various companies would engage petitioner to conduct a tennis clinic or help run a tournament, hand out awards, have his picture taken, and sign autographs, for all of which he would be paid "very, very handsomely." Such activities were compatible with petitioner's relationship with Wilson and approved by it, since it would naturally benefit

from petitioner's exposure in such circumstances, particularly when carrying with him the Wilson racquet. Such activities were nevertheless wholly independent of Wilson, and served to maintain the goodwill associated with petitioner's name in the tennis world that was independently valuable to him.

During the years in issue, petitioner was also president of a golf club which he and his wife owned, though the daily operations of the club were left to a general manager. In addition, petitioner coauthored (with a "ghost") a book about tennis.

Wilson has experienced great success marketing tennis racquets identified with petitioner. The sales of "Jack Kramer" racquets accounted for virtually all of petitioner's royalties from Wilson in 1975 and 1976. Indeed, the "Jack Kramer Autograph" is not only Wilson's all-time best selling racquet,[1] but is also the "greatest seller in America and the history of the industry." Petitioner's name in particular, together with his personal activities to maintain the goodwill associated with his name, have contributed to such favorable results. However, petitioner's name alone would not have been sufficient without the benefit of a strong marketing program; and although the record indicates that Wilson had an extensive and well-developed sales organization, the evidence fails to disclose the full extent of Wilson's own promotional efforts apart from those in which petitioner participated.

At the time of the execution of the 1947 contract and for some years thereafter, the "Jack Kramer" racquet was manufactured for Wilson by a company known as Spaulding. A substantially identical racquet was also produced by Spaulding which it marketed directly as the "Pancho Gonzales Autograph." Yet, sales of the "Jack Kramer Autograph" were some 8 times those of the "Pancho Gonzales Autograph" during the period that both racquets were produced by Spaulding.

The commercial success of a racquet may depend to a very

---

[1] Wilson sells primarily two tennis racquets (or frames) bearing petitioner's name. In addition to the "Jack Kramer Autograph," it markets an identical racquet known as the "Jack Kramer Pro Staff" through shops of tennis professionals. It also markets other racquets of lesser importance bearing the "Jack Kramer" name. All racquets bearing the "Jack Kramer" name are sometimes referred to collectively herein as the "Jack Kramer" racquet.

considerable extent upon the name of the tennis star associated with it. Thus, Wilson at one time had a "Don Budge Autograph" racquet, but when Budge stopped playing and became inactive in tennis circles, his name apparently ceased to have sufficient appeal to purchasers of racquets, and Wilson changed the name, without modifying the racquet, to the "Tony Traber Autograph." Tony Traber had just "won Wimbledon and the U.S. Title," and was then "the biggest name on the scene." The same racquet was substantially renamed as the "Stan Smith Autograph." Other racquets have also been sold by Wilson bearing the "Bill Tildon" and "Ellsworth Vines" names. Indeed, Wilson could just drop the "Kramer" name, and produce and sell the same racquet with someone else's name without paying petitioner any royalty.

Although petitioner appears to have rendered no services in connection with the design or production of the first "Jack Kramer Autograph" during the initial period of some years that it was being produced by Spaulding, he did in fact from time to time thereafter render some assistance to Wilson in connection with testing proposed modifications of racquets manufactured by Wilson.

Petitioner received royalties from Wilson in the amounts of $117,256.58 and $159,648.18 in 1975 and 1976, respectively. In the statutory notice of deficiency, the Commissioner determined that such royalties did not qualify as "earned income" for purposes of either the maximum tax on earned income or the computation of the maximum deductible contribution to petitioner's Keogh plan. In addition, the Commissioner determined that for 1976 petitioner was subject to a 6-percent tax on the resulting excess contribution to his Keogh plan.[2]

OPINION

As in effect in 1975 and 1976, section 1348(a), I.R.C. 1954, limited the maximum tax rate on "earned taxable income" to

---

[2]This tax is imposed by sec. 4972, I.R.C. 1954, which applies only to contributions made in taxable years beginning after Dec. 31, 1975. See sec. 2001(f)(1) and (i)(4), Pub. L. 93–406, 88 Stat. 955, 958 (1974). Thus, petitioner would not be subject to the tax for 1975 regardless of our resolution of the issue presented herein.

50 percent. "Earned taxable income" was defined in section 1348(b)(2)[3] by reference to "earned income," which was in turn defined in section 1348(b)(1) as "any income which is earned income within the meaning of section 401(c)(2)(C)[4] or section 911(b)."[5]

Sections 401(c)(2)(C) and 911(b) were also brought into play to determine "earned income" for purposes of section 404(e)(1), which in 1975 and 1976 limited the deduction for contributions to a pension plan in respect of a self-employed individual to the lesser of $7,500 or 15 percent of the "earned income" derived by the self-employed individual from the trade or business with respect to which the plan was established.[6] Section 404(e)(1) did not itself define "earned income," but the applicable regulation, section 1.404(e)-1(h)(3), Income Tax Regs., states that the term "means earned income as defined in section 401(c)(2) and paragraph (c) of sec. 1.401–10." The

---

[3]Sec. 1348 was amended by sec. 302(a), Pub. L. 94–455, 90 Stat. 1554 (Oct. 4, 1976), to substitute the term "personal service taxable income" for "earned income," effective for taxable years beginning after Dec. 31, 1976. See sec. 302(d), 90 Stat. 1555. In 1981, sec. 1348 was repealed by sec. 101(c)(1), Pub. L. 97–34, 95 Stat. 183 (Aug. 13, 1981).

[4]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(c) DEFINITIONS AND RULES RELATING TO SELF-EMPLOYED INDIVIDUALS AND OWNER-EMPLOYEES.— * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) EARNED INCOME.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(C) INCOME FROM DISPOSITION OF CERTAIN PROPERTY.—For purposes of this section, the term "earned income" includes gains (other than any gain which is treated under any provision of this chapter as gain from the sale or exchange of a capital asset) and net earnings derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property (other than good will) by an individual whose personal efforts created such property.

[5]SEC. 911 EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

[6]The Government has raised no issue here as to whether the royalty income was derived from a trade or business.

latter section of the regulations in turn defines "earned income" as the net earnings from self-employment "to the extent such net earnings constitute compensation for personal services actually rendered within the meaning of section 911(b)." In view of the above, the parties agree that for purposes of both the maximum tax computation and the deduction limitation for contributions to petitioner's Keogh plan, we must decide whether petitioner's royalty income from Wilson was "earned income" within the meaning of section 401(c)(2)(C) or section 911(b). It is therefore important at the very outset to determine as precisely as we can the source of the income (royalties) in issue, and in this connection, we must begin with the contract between petitioner and Wilson.

Wilson agreed to pay petitioner royalties of 2½ percent of net sales of all tennis frames and tennis equipment bearing petitioner's name.[7] In return, petitioner agreed primarily (1) to use in play exclusively Wilson tennis frames and equipment bearing the Wilson trademark and to use his best efforts to promote the sale of such products; (2) to grant Wilson the exclusive world rights and license to manufacture, advertise, and sell tennis frames and tennis equipment identified by petitioner's name, nickname, facsimile signature, and/or portrait; and (3) to make appearances, including appearances at Wilson's dealers' stores, and "conduct clinics and exhibitions at the request of Wilson whenever it is consistent with the interests of both parties." All three of petitioner's foregoing undertakings were part of the original contract executed in 1947, and were included substantially verbatim in the successor contract that governed the years 1975 and 1976 before us. However, the first of these three, to the extent that petitioner agreed to use in play Wilson products, had but little, if any, significance in 1975 and 1976. When the first contract was executed in 1947, petitioner was at the height of his tennis playing career. As an amateur, he had won all of the important tennis tournaments in the world, and he had just turned professional. But by 1975 and 1976, he had long ceased playing competitive tennis, and this undertaking was not

---

[7] It also agreed to pay him 5 cents a dozen on sales of tennis balls bearing his name. However, this aspect of the agreement appears to have contributed little, if anything, to the amount of royalties received by petitioner in 1975 and 1976.

shown by the evidence to have had any appreciable significance during the years 1975 and 1976. On this record, we cannot conclude that any part of the royalties paid to him in those years was compensation for that undertaking.

In sharp contrast, petitioner's grant of exclusive world rights and license to use his name, facsimile signature, etc., in connection with tennis frames and tennis equipment was, in our judgment, of prime significance. As we view the evidence, it was the principal item of consideration for which Wilson paid royalties to him. To be sure, the name alone was not sufficient to sell the "Jack Kramer" racquet. Commercial success depended in addition upon accompanying aggressive promotional activities, and the third of petitioner's undertakings listed above was relevant in this connection. However, the record leaves much to be desired as to the full extent of Wilson's own activities in this regard, wholly apart from those in which petitioner assisted. For aught that appears, petitioner's active assistance pursuant to the agreement, while potentially important, may well have been of lesser consequence than Wilson's own promotional efforts, and in the circumstances, we cannot indulge in speculation to the contrary. Nevertheless, we do think that he did make a meaningful contribution to Wilson's marketing endeavors. Thus, he did participate in marketing programs arranged by Wilson to increase sales of "Jack Kramer" racquets, such as making appearances at dealers' establishments. But not all of petitioner's activities in the tennis world may fairly be included in the services that he was thus required by contract to perform for Wilson, and it was only for the latter services and the use of petitioner's name, facsimile signature, etc., that petitioner received compensation through the royalty agreement. This is made abundantly clear by the last sentence of paragraph 6 of the agreement, which provides:

The royalty payments above provided shall be in full compensation for *all services performed* by Kramer *hereunder* and for *all rights granted* by Kramer to Wilson hereunder. [Emphasis supplied.]

In the presentation of this case, petitioners have attempted to lump together all of Jack Kramer's activities in tennis circles as promotional services which he performed on Wilson's behalf and for which he was compensated by Wilson through royalties. In this connection, there were included

among the stipulated materials petitioner's travel calendars for 1975 and 1976. However, although these calendars revealed some activities that were part of Wilson's promotional program, the bulk of the activities were not shown to be thus integrated. The evidence clearly indicates that petitioner was greatly concerned with his exposure in the tennis world for the purpose of maintaining or even enhancing his name and reputation as an intangible asset—an asset that was highly valuable to him wholly apart from the Wilson contract. Thus, such activities included extensive travel on behalf of Congoleum, the conduct of an American Airlines tournament at Palm Springs, the conduct of the so-called Alan King Tennis Classic at Las Vegas, involvement (not as a participating player) in various other tournaments, etc. Such activities, although without doubt of indirect benefit to Wilson in its sales of "Jack Kramer" racquets, were nevertheless not shown to have been carried on in response to the demands of petitioner's contract with Wilson, nor were they paid for by Wilson. Indeed, petitioner testified that he was paid "very, very handsomely" by other companies who sponsored various tennis events run or managed by him. Nor can we find that petitioner's extensive activities as executive director of the Association of Tennis Professionals (ATP) were included within the services required of him by the Wilson contract. Although such services may have been indirectly beneficial to Wilson, it did not compensate him therefor through the royalties.

The question before us is the proper classification of the royalties received by petitioner from Wilson. Did they qualify as "earned income"? In our judgment these royalties were primarily for the grant of the right to use petitioner's name, facsimile signature, etc., and only secondarily for services that petitioner was required to render under the contract. To the extent that he received compensation for the former, it did not qualify as "earned income." It was for the use of a valuable intangible asset—namely, goodwill associated with his name. To the extent that petitioner was paid for services required to be performed under the contract the royalties did qualify as "earned income," and we are satisfied that he did perform some services as thus required. An allocation is obviously called for. Clearly, precision in making any such allocation is unattainable, but we must do the best we can with the

materials at hand. Taking into account all the evidence, it is our best judgment and we so find as a fact that 70 percent of the royalties received by petitioner represented compensation for the grant of use of petitioner's name, facsimile signature, etc., which did not qualify as "earned income," and that the remaining 30 percent represented payment for services which did qualify as "earned income." Although, as previously indicated, accuracy in making such an allocation is unattainable, allocations of this character have been made in a wide variety of other situations, and are not at all novel. In such circumstances, "a rough approximation is all that we can expect." *DeMink v. United States*, 448 F.2d 867, 870 (9th Cir. 1971). See also *Commissioner v. Ferrer*, 304 F.2d 125, 135 (2d Cir. 1962); *Ditmars v. Commissioner*, 302 F.2d 481, 488 (2d Cir. 1962); *Entwicklungs & Finanzierungs A.G. v. Commissioner*, 68 T.C. 749, 766–767 (1977); *Eisler v. Commissioner*, 59 T.C. 634, 642 (1973); *Potson v. Commissioner*, 22 T.C. 912, 929 (1954), affd. sub nom. *Bodoglou v. Commissioner*, 230 F.2d 336 (7th Cir. 1956).

The parties have cited and discussed a number of decisions in their briefs, but we find none of them to be of any controlling significance in the context of this case. For example, although some of them involved payments in respect of the use of a name (cf. *Armour v. Commissioner*, 22 T.C. 181 (1954); *Reid v. Commissioner*, 26 T.C. 622 (1956); and *Seattle Brewing & Malting Co. v. Commissioner*, 6 T.C. 856 (1946), affd. 165 F.2d 216 (9th Cir. 1948), the issue in those cases was whether the payments represented capital gain rather than ordinary income. No such issue is here presented. There is no dispute in this case that the royalties represented ordinary income; the question before us is whether that ordinary income qualifies as "earned income." Nor do we find sufficiently persuasive analogous situations in *Tobey v. Commissioner*, 60 T.C. 227, 231 (1973); and *Robida v. Commissioner*, 460 F.2d 1172 (9th Cir. 1972), affg. a Memorandum Opinion of this Court (29 T.C.M. 407, 411, 39 P-H Memo T.C. par. 70,086 (1970)), which are discussed at length by the parties. *Robida* did not involve any royalties for use of a name, and *Tobey* is plainly not in point because goodwill, which is inextricably the essence of the valuable use of a name, is explicitly excluded by section 401(c)(2)(C) from classification as "earned income," and

was not involved in *Tobey*. Nor is there any indication that section 911 was intended to have any broader scope. Otherwise, it would indeed be strange if royalties for use of petitioner's name are excluded from classification as "earned income" for purposes of contributions to a Keogh plan under section 404 while at the same time treated as "earned income" for purposes of the maximum tax under section 1348—both of which are involved herein. In our judgment, Congress did not intend such disparate meanings in the two provisions before us.[8] Indeed the regulations make clear that section 911(b), as incorporated into section 1348, was not intended to have any broader scope, because the definition of "earned income" in section 1.1348–3(a)(1), Income Tax Regs., incorporates verbatim the portion of section 401(c)(2)(C) which excludes goodwill. See sec. 1.1348–3(a)(1)(D), Income Tax Regs. Thus, the royalties paid for use of petitioner's name are excluded from classification as "earned income" for purposes of both contributions to a Keogh plan under section 404 and the maximum tax under section 1348.

*Decision will be entered under Rule 155.*

---

[8]Cf. *Hillsboro National Bank v. Commissioner*, 455 U.S. 906, 986, 51 U.S.L.W. 4259, 4267 (Mar. 7, 1983).