# RETIEF GOOSEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23323–09.          Filed June 9, 2011.

P, a professional golfer, entered into endorsement agreements with sponsors Acushnet, TaylorMade, Izod, Upper Deck, Electronic Arts and Rolex. P agreed to allow all sponsors to use his name, face, image and likeness in advertising and marketing campaigns worldwide. P also agreed to perform some services for the sponsors. All endorsement agreements paid P a base endorsement fee. Acushnet, TaylorMade and Izod prorated P's base endorsement fee if he did not annually play in a specified number of golf tournaments. Moreover, Acushnet, TaylorMade and Izod provided bonuses to P for achieving a specific finish in a PGA or European Tour tournament or a specified ranking on the World Golf Rankings. P characterized the endorsement fees and bonuses from Acushnet, TaylorMade and Izod as 50 percent personal services income and 50 percent royalty income on his nonresident Federal income tax returns for 2002 and 2003. P characterized the endorsement fees from Upper Deck, Electronic Arts and Rolex as 100 percent royalty income. P reported approximately seven percent of the total endorsement income as U.S.-source income. R determined that P should have characterized the endorsement fees and bonuses from Acushnet, TaylorMade and Izod as 100 percent personal services income. R also reallocated a larger percentage of P's endorsement fees as U.S.-source income.

   1. *Held*: The endorsement fees and bonuses P received from Acushnet, TaylorMade and Izod are allocated 50 percent to personal services income and 50 percent to royalty income.

   2. *Held*, *further*, the royalty income P received from Acushnet, TaylorMade and Izod is 50 percent U.S.-source income effectively connected with a U.S. trade or business. The royalty income P received from Rolex is 50 percent U.S.-source income not effectively connected with a U.S. trade or business. The royalty income P received from Upper Deck is 92 percent U.S.-source income not effectively connected with a U.S. trade or business. The royalty income P received from Electronic Arts is 70 percent U.S.-source income not effectively connected with a U.S. trade or business.

   3. *Held*, *further*, P does not benefit from any provision under the 1975 or the 2001 U.S.-U.K. income tax treaty.

*Aaron H. Bulloff*, *Stephen L. Kadish*, and *Matthew F. Kadish*, for petitioner.

*Lindsey D. Stellwagen*, *Warren P. Simonsen*, *Nina E. Chowdhry*, and *Jeffrey E. Gold*, for respondent.

KROUPA, *Judge*: Respondent determined that petitioner, a non-domiciliary United Kingdom (U.K.) resident, had Federal income tax deficiencies from income he received from worldwide endorsement agreements for 2002 and 2003 (the years at issue).[1] Respondent determined a $20,224 deficiency for 2002 and a $144,474 deficiency for 2003.

After concessions, there are three issues for decision. The first issue is whether endorsement fees and bonuses petitioner, a U.K. resident, received from worldwide endorsement agreements with Acushnet Company (Acushnet), TaylorMade Golf Company, Inc. (TaylorMade) and Izod Club, a division of Oxford Industries, Inc. (Izod) should be characterized as solely personal services income, solely royalty income or part personal services income and part royalty income. We hold that the income is part personal services income and part royalty income. We next consider whether any income we allocated as royalty income from the Acushnet, TaylorMade and Izod endorsement agreements as well as the royalty income petitioner received from worldwide endorsement agreements with Upper Deck Company, LLC (Upper Deck), Montres Rolex S.A. (Rolex) and Electronic Arts Inc. (Electronic Arts) is from sources within the United States. We hold that a portion of the royalty income from all the endorsement agreements is U.S.-source income. We finally consider whether petitioner, a U.K. resident, may benefit from provisions under the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains, U.S.-U.K., Dec. 31, 1975, 31 U.S.T. 5668 (1975 U.S.-U.K. tax treaty), or the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and on Capital Gains, U.S.-U.K., July 24, 2001, Tax Treaties (CCH) par. 10,901 (2001 U.S.-U.K. tax treaty) (together, the U.S.-U.K. tax treaties).[2] We find he does not.

---

[1] Respondent also determined accuracy-related penalties in the deficiency notice but now concedes that petitioner is not liable for such penalties. Only the deficiencies remain at issue.

[2] The 1975 U.S.–U.K. tax treaty was in force Apr. 25, 1980, until Mar. 31, 2003, at which time the 2001 U.S.–U.K. tax treaty came into force. The treaties are substantially similar and their differences do not affect our decision.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and the accompanying exhibits by this reference. Petitioner, a citizen of South Africa, resided in the United Kingdom at the time he filed the petition.

Petitioner is a professional golfer. He began his professional golf career on the South African Tour in 1988. He earned "Rookie of the Year" in his first year on the South African Tour, and he developed as one of the better golfers in South Africa. Petitioner's success in South Africa allowed him to earn his tour card[3] on the European Tour in 1991. Petitioner met his wife, a citizen of the United Kingdom, shortly after joining the European Tour, and the two decided to make London, England, their permanent residence.

Petitioner was required as a member of the European Tour to play in a minimum of 11 European Tour tournaments each year to maintain his tour card. Petitioner annually exceeded that amount. He traveled to European Tour tournaments throughout Europe as well as Australia and the Far East. Petitioner became one of the most successful and popular golfers on the European Tour. He ranked as the number one golfer on the European Tour's money list in 2001 by earning the most prize money.

*Petitioner's Golf Career in the United States*

Though popular on the European Tour, petitioner was unknown in the United States leading up to the years at issue. Petitioner rarely played in the United States, and he did not have a U.S. Professional Golf Association Tour (PGA Tour) card. He instead focused on maintaining his status and high ranking on the European Tour. Petitioner's career took a dramatic upswing when he won the 2001 U.S. Open golf tournament in Tulsa, Oklahoma. The U.S. Open is one of four prestigious Major Championships in professional golf,[4] and professional golfers are largely remembered for how they

---

[3] A professional golfer must obtain and maintain a tour card to play on a particular golf tour. Each golf tour has its own requirements for obtaining and maintaining a tour card that often include attending a tour school and participating in a certain number of tour tournaments each year.

[4] The other three Major Championships are the Masters, the British Open, and the PGA Championship.

perform in these tournaments. Petitioner's profile sky-rocketed both in the United States and globally after winning the U.S. Open.

Petitioner automatically obtained his PGA Tour card when he won the U.S. Open. He was required, as a member of the PGA Tour, to play at least 13 PGA Tour tournaments a year. Petitioner thereafter began to play in the United States more regularly to maintain his PGA Tour card. Petitioner was able to satisfy the tour card requirements of both the PGA and European Tours because many tournaments in which he played were classified as both PGA Tour tournaments and European Tour tournaments. Petitioner played in approximately 36 tournaments a year during the years at issue, spending most of his time in the United States and Europe.

*IMG and Petitioner's Financial Management*

Petitioner hired IMG World, Inc. (IMG), an international sports media entertainment group, to represent him and manage his career and finances. IMG was started in the 1960s with a handshake between Attorney Mark McCormack and golf legend Arnold Palmer. IMG revolutionized sports marketing by promoting athletes for endorsement deals with sponsors. Sponsors paid to have the athlete's name, face, image and likeness (name and likeness) associated with the sponsor. IMG's approach allowed clients to be concerned only with playing their respective sports. IMG would take care of the rest. IMG therefore expanded its role from simply promoting its clients to managing all its clients' business and personal affairs.

IMG also included tax planning strategies as part of its financial planning for its clients. IMG developed a strategy for its clients that was intended to reduce their worldwide income taxes if they were U.K. residents like petitioner. This strategy was designed to keep certain income out of the United Kingdom. To effectuate this plan, IMG directed its U.K.-resident clients to enter into employment contracts with two IMG-controlled entities, European Sports Promotions Limited (ESP) and European Tournament Organizers Limited (ETO). All income from the clients' sports-related activities or endorsements was directed to either an ESP (U.K. income) or

an ETO (non-U.K. income) bank account in Liechtenstein.[5] The clients' endorsement earnings and prize winnings inside the United Kingdom were contracted and paid to ESP (U.K. income), and those outside the United Kingdom were contracted and paid to ETO (non-U.K. income). Each entity would issue the client a fixed annual salary and bonus. The client's bonus would not be paid until the entity subtracted expenses, including the client's salary, administrative fees and IMG management fees.

Petitioner's agent at IMG, Greg Kinnings (Mr. Kinnings), determined that petitioner would be a prime candidate for entering into employment agreements with ETO and ESP. Petitioner agreed to be employed by ESP and ETO. Petitioner's golf-related earnings, including endorsement income, prize money and appearance fees, were directed to ETO for the non-U.K. income or ESP for the U.K. income. ETO (non-U.K. income) transferred petitioner's salary and bonus to his Guernsey[6] bank account, and ESP (U.K. income) transferred petitioner's salary and bonus to his London bank account. This structure ensured that petitioner's U.K.-source income would be repatriated to the United Kingdom and his non-U.K.-source income would remain outside the United Kingdom. The U.K. tax authorities approved this employment structure.

*Marketing of Petitioner's Name and Likeness*

IMG also successfully marketed petitioner to sponsors during the years at issue. Petitioner entered, either directly or through ETO (non-U.K. income) or ESP (U.K. income), into several endorsement agreements and appearance agreements with sponsors. Endorsement agreements allow the sponsor to use the athlete's name and likeness to advertise and promote the sponsor's products for a specified period of time. Appearance agreements allow the sponsor to use the athlete's name and likeness only in connection with the advertising and promotion of a specific tournament or event. Sponsors value an endorsement agreement based on the strength of an athlete's brand or image and the sponsor's ability to be associated with that brand or image. Sponsors consider the athlete's rel-

---

[5] Liechtenstein is known for its financial secrecy laws and was considered a tax haven during the years at issue.

[6] Guernsey has also been considered a tax haven.

evance to a targeted market segment, the athlete's performance in his sport and the athlete's personality and appearance. Moreover, sponsors generally look for athletes that carry themselves in a professional and moral manner on and off the playing field.

Petitioner's accomplishments on the golf course made him famous, though it was his image that made him marketable. Golf is often called "the gentleman's game," and many sponsors see petitioner as one who epitomizes the gentleman golfer. Petitioner has maintained a positive image throughout his career. Sponsors appreciate his cool demeanor on the course, his golf success, his recognition around the world and his involvement in charities and other notable causes. He is often branded as "the Goose" because of his name or "Iceman" because he is cool under pressure. [7]

Petitioner's name and likeness have been marketed in South Africa and Europe since the 1990s. Sponsors began to aggressively market petitioner in the United States and increased his global marketing following his 2001 U.S. Open victory. Petitioner entered into or renegotiated six endorsement agreements during the years at issue. Petitioner entered into endorsement agreements with TaylorMade, Izod, Acushnet, Rolex, Upper Deck and Electronic Arts. These sponsors had global reach and were consistent with petitioner's image and brand. The TaylorMade, Izod and Acushnet endorsement agreements (collectively, the on-course endorsement agreements) required petitioner to wear or use their products during golf tournaments. In contrast, the Rolex, Upper Deck and Electronic Arts endorsement agreements (collectively, the off-course endorsement agreements) did not have this requirement.

*TaylorMade Endorsement Agreement*

TaylorMade makes golf clubs and golf accessories, including golf bags and golf club head covers. Petitioner has used TaylorMade golf clubs his entire career because he considers TaylorMade golf clubs the best in the world. ETO and ESP each entered into a 4-year agreement with TaylorMade (collectively, TaylorMade agreements) in 2002. ETO (non-U.K. income) and ESP (U.K. income) licensed to TaylorMade

---

[7] These nicknames were also associated with characters in the popular movie "Top Gun."

the right to use petitioner's name and likeness on TaylorMade golf apparel, equipment and accessories. The TaylorMade agreements required petitioner to wear TaylorMade clothing and headgear as well as to use TaylorMade golf clubs, golf club head covers and golf bags during tournaments and golf-related activities. Petitioner also had to provide two service days to pose for television commercials, for print advertising and for promotional materials as well as six personal appearance days to promote TaylorMade products at golf events. Petitioner further agreed to test and examine TaylorMade golf products.

TaylorMade agreed to pay a $400,000 annual endorsement fee. The TaylorMade agreements attributed $300,000 of the $400,000 to ETO (non-U.K. income) and the remaining $100,000 to ESP (U.K. income). Petitioner had to complete two rounds of golf in a minimum of 20 PGA Tour tournaments and 11 European Tour tournaments per year to secure the TaylorMade endorsement fees. If he failed to play in the minimum number of tournaments, the endorsement fees were prorated. Moreover, ETO and ESP would receive a bonus if petitioner won a specified golf tournament (tournament bonus) or achieved a specified ranking on the World Golf Rankings (ranking bonus). The bonus payments were to be allocated 25 percent to ESP (U.K. income) and 75 percent to ETO (non-U.K. income). The TaylorMade agreements did not explain the reason for this bonus allocation.

TaylorMade reserved the right to terminate the TaylorMade agreements if petitioner committed any act that materially reduced the value of the TaylorMade agreements or violated public morality or decency (morals clause). TaylorMade further reserved the right to terminate the TaylorMade agreements if petitioner was convicted of any criminal offense or found to have possessed drugs or other illegal substances (illegal activities clause).

*Izod Endorsement Agreement*

Izod, an apparel company, sought petitioner to promote its men's golf apparel line. ETO and ESP each entered into a 3-year endorsement agreement with Izod (collectively, the Izod agreements) in 2001. ETO (non-U.K. income) and ESP (U.K. income) licensed to Izod the right to use petitioner's name

and likeness on Izod apparel and accessories. The Izod agreements required petitioner to wear Izod products exclusively when engaged in golf tournaments and other golf-related activities and to provide two international appearance days of up to six hours each on behalf of Izod.

Izod agreed to pay ETO (non-U.K. income) a $33,750 endorsement fee for 2002 and $37,500 endorsement fee for 2003. Izod agreed to pay ESP (U.K. income) an $11,250 endorsement fee for 2002 and a $12,500 endorsement fee for 2003. The endorsement fees would be prorated based on tournaments played if petitioner failed to compete in 18 PGA or European Tour tournaments per year. ETO (non-U.K. income) and ESP (U.K. income) were eligible to receive tournament bonuses and ranking bonuses under the Izod agreements. The total bonus payments were allocated 25 percent to ESP (U.K. income) and 75 percent to ETO (non-U.K. income). The Izod agreements did not explain the reason for this bonus allocation. The Izod agreements also contained a morals clause and an illegal activities clause.

*Acushnet Endorsement Agreement*

Acushnet manufactures various sports merchandise, including Titleist brand golf balls and golf gloves. Petitioner has used Acushnet products for most of his golfing career. Petitioner directly entered into a 2-year endorsement agreement with Acushnet (Acushnet agreement) following his win at the 2001 U.S. Open. Petitioner licensed to Acushnet the right to use his name and likeness in connection with its advertisement, promotion and sale of Titleist golf balls and golf gloves. Petitioner also agreed to play with Titleist golf balls and golf gloves in all golf tournaments, exhibitions, clinics and other events worldwide. Petitioner agreed to participate in four days of public relations activities as well as television commercials for advertising and promoting Acushnet products. The Acushnet agreement also required petitioner to develop and test Acushnet golf products.

Acushnet agreed to pay petitioner a $350,000 endorsement fee for 2002 and a $375,000 endorsement fee for 2003, plus tournament bonuses and rankings bonuses. The endorsement fee would be prorated if petitioner failed to compete in 20 PGA or European Tour tournaments per year. Petitioner

thereafter authorized ESP and ETO to invoice and collect all monies due under the Acushnet agreement for all U.K. and non-U.K. activities. Petitioner directed that 25 percent of the endorsement fees and bonuses from Acushnet be allocated to ESP (U.K. income) and 75 percent be allocated to ETO (non-U.K. income).

*Rolex Endorsement Agreement*

Rolex is a Swiss manufacturer of luxury timepieces. Petitioner directly entered into a 3-year endorsement agreement with Rolex in 2001 (Rolex agreement). Petitioner licensed to Rolex the right to use his name and likeness in any medium in connection with the advertisement, promotion and sale of Rolex timepieces worldwide. The Rolex agreement did not require petitioner to take part in any golfing activities. It did require, however, petitioner to use all reasonable efforts to wear a Rolex timepiece when featured in any medium or when appearing in public engagements worldwide. He also agreed to be reasonably available for interviews, photographs or films relating to Rolex's products.

Rolex agreed to pay a $50,000 annual endorsement fee to petitioner. Petitioner thereafter authorized ESP and ETO to invoice and collect all monies due under the Rolex agreement. Petitioner asked that 25 percent of the endorsement fees from Rolex be allocated to ESP (U.K. income) and 75 percent be allocated to ETO (non-U.K. income).

*Upper Deck Endorsement Agreement*

Upper Deck is an international sports and entertainment products company that produces golf trading cards. Petitioner entered into a 14-month letter agreement with Upper Deck in 2001 (Upper Deck agreement). Petitioner licensed to Upper Deck the right to use his name and likeness worldwide in connection with the production, marketing, advertising, promotion and sale of Upper Deck's golf trading cards. Petitioner agreed to sign 3,500 trading cards per year as well as provide five shirts, five pairs of gloves, two hats and one golf bag, each of which he used during practice or in a golf tournament.

Upper Deck agreed to pay petitioner a $42,500 endorsement fee. Half of the endorsement fee was paid within 30

days of executing the agreement, and the remaining 50 percent was paid 30 days after petitioner performed all required services under the agreement. He authorized ESP and ETO to invoice and collect all monies due under the Upper Deck agreement. The Upper Deck agreement contained a morals clause and an illegal activities clause.

*Electronic Arts Endorsement Agreement*

Electronic Arts develops, markets and distributes video games, including Tiger Woods PGA Tour, a series of golf video games. ETO and ESP each entered into a 3-year endorsement agreement with Electronic Arts in 2003 (collectively, the Electronic Arts agreements). ETO (non-U.K. income) and ESP (U.K. income) licensed to Electronic Arts the right to use petitioner's name and likeness in its software products, including Tiger Woods PGA Tour 2004 (the video game). The territory of ETO's license to Electronic Arts (ETO-Electronic Arts agreement) was worldwide, except for the United Kingdom. The territory of ESP's license to Electronic Arts (ESP-Electronic Arts agreement) was the United Kingdom. The ETO Electronic Arts agreement required petitioner to provide two 4-hour product development sessions and to provide nine photographs to enable Electronic Arts to recreate petitioner's likeness. The ESP-Electronic Arts agreement did not contain any service requirement.

Electronic Arts agreed to pay ETO $22,500 upon signing the ETO-Electronic Arts agreement and $11,250 on or before January 1, 2004. Electronic Arts agreed to pay ESP (U.K. income) $7,500 upon signing the ESP-Electronic Arts agreement and $3,750 on or before January 1, 2004.

*U.S. Income Taxes and Returns*

MAI Wealth Advisors (MAI) prepared and filed for petitioner nonresident alien Federal income tax returns for the years at issue. MAI is owned by principals of IMG. MAI manages the financial affairs of athletes and other high-net-worth individuals. MAI treated petitioner as having received the endorsement income directly from the sponsors, rather than from ETO or ESP.

Petitioner reported all prize money from golf tournaments and appearance fees in the United States as effectively con-

nected income taxable in the United States. Petitioner characterized his endorsement fees and bonuses from the on-course endorsements as 50 percent royalty income and 50 percent personal services income. Petitioner reported his on-course endorsement fees and tournament bonuses as 3.4 percent U.S.-source royalty income. He sourced the personal services income from the on-course endorsement fees and tournament bonuses to the United States based on the number of days he played inside the United States over the total days he played golf for the year. Petitioner sourced the personal services income portion of his ranking bonuses from the on-course endorsement agreements based on a ratio of his U.S. prize winnings to his worldwide prize winnings.

Petitioner characterized his endorsement fees from the off-course endorsement agreements as 100 percent royalty income. Petitioner reported 6.8 percent of endorsement fees from Rolex and Electronic Arts as U.S.-source royalty income and 9.1 percent of the payments from Upper Deck as U.S.-source royalty income.[8]

Respondent audited petitioner's returns and mailed him the deficiency notice. Respondent allocated the endorsement fees generated from the on-course endorsement agreements based on the number of U.S. tournaments petitioner played in comparison to the number of worldwide tournaments he played. Respondent allocated all tournament bonuses from tournaments played in the United States to the United States. Respondent allocated the ranking bonuses based on the ratio of U.S. prize money to worldwide prize winnings. Respondent agreed that petitioner's income from the off-course endorsement agreements was royalty income. Respondent determined, however, that 25 percent of the royalty income should be U.S.-source income rather than the less than 10 percent U.S.-source income petitioner reported. Respondent determined based on these adjustments that petitioner underreported taxable income for the years at issue.

Petitioner timely filed a petition challenging respondent's determinations. The parties have been able to resolve some

---

[8] Petitioner contends he calculated his royalty income percentages using a 12-market model, which allocated 25 percent of the endorsement fees to the United Kingdom and 75 percent of the endorsement fees evenly among 11 other world markets. He has provided few details of the 11 other world markets or how this calculation works.

issues but they still dispute the deficiency amounts as they relate to the on-course and off-course endorsement agreements. The parties stipulated that any income from the on-course endorsement agreements characterized as personal services income should be sourced 41.7241 percent to the United States for 2002 and 42.7397 percent to the United States for 2003. The parties also stipulated that all tournament bonus income is U.S.-source and all ranking bonus income is U.S.-source based on the ratio of U.S. prize winnings to worldwide prize winnings.

### OPINION

We are asked to decide how petitioner, a U.K. resident, should characterize and source the income he received under the worldwide endorsement agreements for U.S. tax purposes. Petitioner contends that the sponsors paid the endorsement income primarily for the right to use his name and likeness, not for any services he may have provided. He argues that the endorsement income should therefore be taxed as U.S.-source royalty income. Respondent counters that the sponsors paid him the endorsement income primarily for personal services and therefore such income should be taxed as U.S.-source personal services income. The parties also dispute whether petitioner is eligible for any benefits under the U.S.-U.K. tax treaties. We begin by examining the burden of proof.

### I. *Burden of Proof*

In general, the Commissioner's determinations in the deficiency notice are presumed correct, and the taxpayer has the burden of proving that the Commissioner's determinations are in error. See Rule 142(a);[9] *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner in certain situations. Sec. 7491(a)(2)(A) and (B). Petitioner does not argue nor do we find that the burden of proof has shifted to respondent.

---

[9] All section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

II.  *Taxation of Nonresident Aliens Under the Code*

We now consider how petitioner's endorsement income should be taxed in the United States. The United States generally taxes nonresident aliens only if they engage in a U.S. trade or business or receive U.S.-source fixed and determinable annual or periodic income. See sec. 864(b). Engaging in a U.S. trade or business includes any business activity in the United States that involves one's own physical presence. See sec. 1.864–2, Income Tax Regs. The parties agree that petitioner's golf play in the United States amounts to his engaging in a U.S. trade or business. We must therefore determine the character and source of the income and whether such income was effectively connected with his golf play in the United States. We will consider each issue in turn. We begin by considering the character of the income.

A.  *Character of Income—Personal Services Income or Royalties*

We first decide whether the endorsement income constitutes personal services income or royalty income. The parties agree that the endorsement fees under the off-course endorsement agreements constitute royalty income. We will therefore examine endorsement income only from the on-course endorsement agreements, which include the TaylorMade, Izod and Acushnet agreements.

Petitioner asserts that the sponsors paid him for the right to co-market and co-brand their products with petitioner's name and likeness. Courts have repeatedly characterized payments for the right to use a person's name and likeness as royalties because the person has an ownership interest in the right. See *Cepeda v. Swift & Co.*, 415 F.2d 1205 (8th Cir. 1969); *Haelan Lab., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953); cf. *Boulez v. Commissioner*, 83 T.C. 584 (1984) (intellectual property creator receives only personal services income if the creator lacks an ownership interest in the underlying property); *Kramer v. Commissioner*, 80 T.C. 768 (1983); *Uhlaender v. Hendricksen*, 316 F. Supp. 1277 (D. Minn. 1970). Petitioner submitted an expert report from Jim Baugh (Mr. Baugh), former president of Wilson Sporting Goods, to support his contention that TaylorMade, Izod and Acushnet paid for his name and like-

ness rather than for the performance of services. Mr. Baugh has spent more than 35 years in sports marketing and has extensive experience in professional athlete endorsement agreements.

Respondent argues that the sponsors primarily paid petitioner to perform personal services. Respondent argues that the personal services petitioner was required to perform included playing golf and carrying or wearing the sponsors' products. Respondent relies on this personal services argument by focusing on the proration of the endorsement fees if petitioner failed to play in a specific number of golf tournaments. Respondent claims that any income received for the use of petitioner's name and likeness should be considered de minimis.

The characterization of petitioner's on-course endorsement fees and bonuses depends on whether the sponsors primarily paid for petitioner's services, for the use of petitioner's name and likeness, or for both. See *Or. State Univ. Alumni Association v. Commissioner*, 193 F.3d 1098 (9th Cir. 1999), affg. T.C. Memo. 1996–34; *Boulez v. Commissioner*, *supra*; *Kramer v. Commissioner*, *supra*. We must divine the intent of the sponsors and of petitioner from the entire record, including the terms of the specific endorsement agreement. See *Ark. State Police Association, Inc. v. Commissioner*, 282 F.3d 556, 560 (8th Cir. 2002).

The on-course endorsement agreements granted sponsors TaylorMade, Izod and Acushnet the right to use petitioner's name and likeness for advertising and promotional materials worldwide. Petitioner also agreed to wear or use the sponsors' products, make promotional appearances and participate in photo and filming days. The sponsors paid petitioner a base endorsement fee, though the fee would be prorated if he did not play in a specified number of tournaments. The sponsors also paid petitioner tournament and ranking bonuses based on his on-course performance. The endorsement agreements fail to allocate the endorsement income between services petitioner was to provide and the amount paid for the right to use petitioner's name and likeness. As we view the record as a whole, we find that the sponsors paid for both the services provided and the right to use petitioner's name and likeness.

The record shows that petitioner's name and his associated international reputation had a value beyond his golf skills and abilities. See *Kramer v. Commissioner*, *supra*. Petitioner spent many years developing his image. He started in South Africa, and then he flourished in the European Tour. He was one of the top professional golfers and was recognizable worldwide.

Charles Prestagacio (Mr. Prestagacio), Senior Vice President of Global Sports Marketing for TaylorMade, testified that TaylorMade paid petitioner to appear at tournaments as well as to use his name and likeness in connection with its products. He stated that TaylorMade viewed petitioner not only as a golfer, but as a brand ambassador. TaylorMade valued its endorsement agreement with petitioner because it appreciated petitioner's image. TaylorMade wanted to be associated with his cool and professional persona. Mr. Prestagacio stated that TaylorMade marketed petitioner's image globally, year round. TaylorMade, as well as the other on-course endorsement sponsors, co-branded their products with petitioner in magazine and newspaper advertisements, promotional materials and television commercials distributed all over the world. TaylorMade was paying for petitioner's image. He was not paid per advertisement or news clipping. Moreover, he played in golf tournaments all over the world to ensure he complied with his tour card requirements, not to earn endorsement fees per se.

Acushnet and Izod even included a morals clause and an illegal activities clause in their respective endorsement agreements to terminate the agreements if petitioner compromised his image. Mr. Baugh cited the rise and fall of Tiger Woods (Mr. Woods) as an endorser to illustrate the importance sponsors place on an athlete's image. Mr. Woods built the most powerful, valuable and carefully orchestrated brand and image in sports. He lost most of his sponsorships, however, when his extra-marital affairs made front page news. Sponsors determined that Mr. Woods' image was no longer compatible with their products.

Mr. Baugh's report also stated that an athlete's image is often more important than an athlete's performance on the course. Mr. Baugh highlighted the contrast between TaylorMade's on-course endorsements with petitioner and those with Sergio Garcia (Mr. Garcia). Petitioner ranked

either near or higher than Mr. Garcia on the PGA Tour and World Golf Rankings during the years at issue. Petitioner had won a Major Championship as well as several high-pro-file tournaments on the European Tour. In contrast, Mr. Garcia had failed to win a Major Championship and had few significant wins. Despite this difference in golf performance, both petitioner and Mr. Garcia entered into substantially similar endorsement agreements with TaylorMade. In addition, Mr. Garcia was paid substantially more than petitioner despite his lesser record. TaylorMade valued Mr. Garcia's flash, looks and maverick personality more than petitioner's cool, "Iceman" demeanor. We find that TaylorMade, Izod and Acushnet valued petitioner's image, and they paid substantial money for the right to use his name and likeness.

The record also shows that the sponsors valued petitioner's play at tournaments. Petitioner agreed to make promotional appearances at tournaments and to wear or use the sponsors' products. Moreover, the sponsors conditioned the full endorsement fee on petitioner's playing in a specified number of tournaments. Otherwise, the sponsors would prorate his endorsement fees. The sponsors could use petitioner's image in all of their advertising campaigns worldwide, but the sponsors would pay petitioner only if he played golf. His tournament bonuses were based solely on how he performed in specific tournaments. If he performed well throughout the year, he could receive a ranking bonus. We find that the performance of services requirement was not de minimis or ancillary to the use of his name and likeness. Accordingly, we find that the income received from the on-course endorsement agreements was part royalty income and part personal services income.

We find it appropriate to allocate the endorsement fees from the on-course endorsements between personal services income and royalty income. While we recognize that precision in making such an allocation is unattainable, we must do the best we can with the evidence presented. *Kramer v. Commissioner*, *supra*; see *DeMink v. United States*, 448 F.2d 867, 870 (9th Cir. 1971); *Commissioner v. Ferrer,* 304 F.2d 125, 135 (2d Cir. 1962), revg. 35 T.C. 617 (1961); *Ditmars v. Commissioner*, 302 F.2d 481, 488 (2d Cir. 1962), revg. T.C. Memo. 1961–105. We must examine all the surrounding facts and circumstances. *Kramer v. Commissioner*, *supra*. The sponsors

paid for the right to use petitioner's name and likeness and to be associated with his image. Petitioner's endorsement income depended, however, on his playing in tournaments. The record shows that the performance of services and the use of name and likeness were equally important. We find that 50 percent of the endorsement fees petitioner received represented royalty income and 50 percent represented personal services income.

### B. *Sourcing and Effectively Connected Income*

We must next determine what portion of the endorsement income should be sourced to the United States. We accept the parties' stipulations for sourcing the personal services income, tournament bonuses and ranking bonuses to the United States. The parties disagree as to what portion of the royalty income from the on-course and off-course endorsement fees should be U.S.-source income. We first consider what portion of the royalty income is U.S.-source income. We then consider whether any U.S.-source royalty income was effectively connected to a U.S. trade or business.

### 1. *Sourcing Petitioner's Royalties*

Royalty income paid for the right to use intangible property generally is sourced where the property is used or is granted the privilege of being used. Secs. 861(a)(4), 862(a)(4). For example, royalty income received for the use of trademarks in making foreign sales is sourced outside the United States. Rev. Rul. 68–443, 1968–2 C.B. 304. Thus, we must consider where petitioner's name and likeness were used or would be used to determine the source of petitioner's royalty income.

Taxpayers must make an appropriate sourcing allocation if the royalty income relates to the right to use property both within and outside the United States. The contracting parties to the transaction have the burden of making a reasonable allocation of the royalty income between the U.S. and foreign sources. Here, petitioner granted his sponsors the right to use his name and likeness worldwide. The contracting parties agreed to source 25 percent to the United Kingdom and 75 percent to the rest of the world. The contracting parties did not specify, however, how the income should be sourced

to the United States. We therefore cannot accept their sourcing allocation for purposes of determining U.S.-source royalty income.

Courts have generally allocated all the royalty income to the United States if the contracting parties failed to make a reasonable allocation, unless the taxpayer can show there is a sufficient basis for allocating the income between U.S. and foreign sources. See *Misbourne Pictures Ltd. v. Johnson*, 189 F.2d 774, 775 (2d Cir. 1951); *Molnar v. Commissioner*, 156 F.2d 924 (2d Cir. 1946), affg. a Memorandum Opinion of this Court; *Rohmer v. Commissioner*, 153 F.2d 61, 65 (2d Cir. 1946), affg. 5 T.C. 183 (1945). A sufficient basis exists when a taxpayer establishes that he or she has property rights outside the United States and furnishes evidence on the value of those rights. See *Wodehouse v. Commissioner*, 178 F.2d 987 (4th Cir. 1949), affg. in part and revg. in part 8 T.C. 637 (1947).

Petitioner has established that he owns the rights to his name and likeness outside the United States and that those rights have value. We must therefore determine the value of those rights by examining where the sponsors actually used petitioner's name and likeness. Petitioner's name and likeness were used in magazine and newspaper advertisements, commercials, websites and other promotional materials. The parties have presented little statistical evidence on the use of petitioner's name and likeness. This does not absolve us, however, from valuing rights merely because there is difficulty in fixing their value. *Id.* We therefore consider the evidence to make the reasonable sourcing allocation.

### a.   *Upper Deck and Electronic Arts Endorsement Fees*

We first consider sourcing petitioner's royalty income from Upper Deck and Electronic Arts. The record reflects that Upper Deck sold 92 percent of its golf cards in the United States and eight percent outside the United States. The record reflects that Electronic Arts sold 70 percent of the video games in the United States and 30 percent of the video games outside the United States. The parties do not dispute these sales figures.

We recognize that product sales do not necessarily reflect the relative worldwide value of the intangible rights. See

*Molnar v. Commissioner*, *supra*; *Rohmer v. Commissioner*, *supra*. Here, however, the golf card and video game sales appear to indicate where Upper Deck and Electronic Arts used petitioner's name and likeness. Petitioner added value to both Upper Deck's and Electronic Arts' international sales because he was a citizen of South Africa, resided in England and played worldwide. The record shows, however, that the golf cards and the video game were primarily marketed in the United States. Petitioner's name and likeness also were valued greatly in the United States following his 2001 U.S. Open win.

Moreover, petitioner's name and likeness value was inextricably tied to the sales of the video game and golf cards. Petitioner's endorsement agreement granted Electronic Arts the right to use petitioner's name and likeness only with the video game, and not in advertising or other promotional materials. The parties agree that Upper Deck's golf card sales, rather than its use of petitioner's name and likeness in advertising and promotional material, should be a determining factor in sourcing the Upper Deck endorsement fees. We agree.

We find that the sale of the trading cards and video game provide a sufficient basis for determining where Upper Deck and Electronic Arts used petitioner's name and likeness rights. We therefore find that petitioner's royalty income from Upper Deck is 92 percent U.S.-source income and Electronic Arts is 70 percent U.S.-source income.

### b. *On-Course and Rolex Endorsement Fees*

We next consider whether the parties presented sufficient evidence to value petitioner's royalty income under the on-course and Rolex endorsement agreements. Petitioner, Mr. Kinnings and Mr. Prestagacio all testified that petitioner was marketed aggressively in the United States following his 2001 U.S. Open victory. Petitioner testified that the United Kingdom, United States and South Africa were his three largest markets for golf endorsements. We find perplexing, however, that he allocated 25 percent of his royalty income to the United Kingdom and only 6.4 percent of his royalty income to the United States. On the evidence presented, we

cannot accept petitioner's contention that less than seven percent of his royalty income is U.S.-source income.

We look to the rest of the facts. Petitioner has shown that the sponsors paid for the right to use petitioner's name and likeness outside the United States. Petitioner has demonstrated that he had a global image and that he was marketed all over the world. His market includes the United Kingdom, the United States, South Africa, Australia and the Far East. Thus, it would be unreasonable to source all the royalties to the United States. Petitioner testified that the United States is the largest golf market in the world, and it is one of his largest markets for golf endorsements. Taking into account all the evidence, it is our best judgment and we so find that 50 percent of the royalty income petitioner received from the on-course and Rolex endorsement agreements is U.S.-source income.

### 2. *Effectively Connected Income*

We next consider whether such U.S.-source income is effectively connected with a U.S. trade or business. The parties agree that petitioner engaged in the U.S. trade or business of playing golf. A nonresident alien engaged in a U.S. trade or business is taxed on income that is effectively connected with the conduct of that trade or business. Sec. 882(a)(1). We apply different rules depending on whether the income is U.S.-source income or not U.S.-source income. In the case of U.S.-source income that is effectively connected with a U.S. trade or business, a nonresident alien will be subject to the graduated tax rates applicable to U.S. residents. In the case of U.S.-source income that is not effectively connected with a U.S. trade or business and consists of rents, dividends, royalties or other fixed or determinable annual or periodic income, the nonresident alien will be subject to a flat 30-percent withholding tax. The parties do not argue, nor do we find, that petitioner maintained an office or fixed place of business in the United States. We therefore find that petitioner is not subject to U.S. tax on his income that is not from U.S. sources.

The parties also do not dispute that petitioner's personal services were effectively connected with petitioner's golf play and that the U.S.-source income earned playing golf is taxed

at regular graduated rates. We must still determine whether petitioner's U.S.-source royalty income is effectively connected with his U.S. trade or business. U.S.-source royalty income will be effectively connected with a U.S. trade or business if the activities of the trade or business are a material factor in realizing the royalty income. Sec. 1.864–4(c)(3)(i), Income Tax Regs. [10] We will consider separately the U.S.-source royalty income petitioner received under the on-course endorsement agreements and that under the off-course endorsement agreements.

We first consider whether petitioner's U.S.-source royalty income from the on-course endorsement agreements was effectively connected with his golf play in the United States. As we previously discussed, petitioner's income from the use of his name and likeness depended on whether he played in a specified number of golf tournaments. In other words, petitioner's participation in a golf tournament was material to receiving income for the use of his name and likeness. We therefore find that such income is effectively connected with a U.S. trade or business, and petitioner will be subject to the graduated tax rates applicable to U.S. residents.

We next consider whether petitioner's U.S.-source royalty income from the off-course endorsement agreements was effectively connected with a U.S. trade or business. The income petitioner received from the off-course endorsement agreements did not depend on whether he played in any golf tournaments. He would be paid regardless of whether he played in or won any tournament. Moreover, the off-course endorsement agreements did not require petitioner to be physically present in the United States. We therefore find that the income petitioner received from off-course endorsement agreements was not effectively connected with a U.S. trade or business. See sec. 1.864–4(c)(3)(ii), *Example (2)*, Income Tax Regs. Accordingly, a flat 30-percent tax is imposed on petitioner's gross U.S.-source royalty income from the off-course endorsement agreements. See secs. 881(a), 871(a)(1).

---

[10] There is also an asset test in sec. 864(c)(2), not relevant here. Sec. 1.864–4(c)(2)(i), (3)(i), Income Tax Regs.

III.  *Effect of U.S.–U.K. Tax Treaties*

We finally consider whether petitioner benefits from the U.S.–U.K. tax treaties. The fundamental purpose of a tax treaty is to avoid the uncoordinated taxation of an individual's income by two different countries. Tax treaties seek to avoid double taxation as well as prevent fiscal evasion. The Code applies with due regard to any applicable treaty obligation of the United States. Sec. 894(a)(1). We therefore consider whether petitioner would receive any benefits under the U.S.-U.K. tax treaties that he did not receive under the Code.

The U.S.-U.K. tax treaties provide that the United Kingdom will tax a U.K. resident non-domiciliary on non-U.K. source income only to the extent the income is remitted to or received in the United Kingdom. See 1975 U.S.-U.K. tax treaty art. IV(5); 2001 U.S.-U.K. tax treaty art. I(7). In such a case, the United States may not subject the U.K. resident to tax on specified kinds of income to avoid double taxation. Petitioner may therefore benefit from the U.S.-U.K. tax treaties regarding payments made to ESP (U.K. income) and ETO (non-U.K. income) that were remitted to or received in the United Kingdom. The parties agree that the endorsement income ETO (non-U.K. income) received was not remitted to or received in the United Kingdom. Petitioner argues, however, that he should benefit from the U.S.-U.K. tax treaties to the extent ESP (U.K. income) remitted his salary and bonuses to his U.K. bank account.

We now consider whether petitioner's endorsement income was remitted to or received in the United Kingdom. Petitioner's sponsors wired their payments to ESP's (U.K. income) bank account in Liechtenstein. In addition to his endorsement income, ESP (U.K. income) received on petitioner's behalf significant amounts of prize money, bonuses, non-U.S. royalties and appearance fees. ESP (U.K. income) paid petitioner a salary and a bonus that were based on the total amount deposited into the ESP (U.K. income) bank account in Liechtenstein. Petitioner submitted statements from his U.K. bank account showing transfers from ESP (U.K. income) into his U.K. bank account of £495,206 in 2002 and £12,500 in 2003. Petitioner has not established, however, whether these salary and bonus payments constitute endorsement income

or another type of income. We find no evidence in the record that any or all of the income received into the account was endorsement income paid by TaylorMade, Izod, Acushnet, Upper Deck, Electronic Arts or Rolex.

Petitioner has failed to meet his burden of proving that endorsement income ESP (U.K. income) received on his behalf has been remitted to or received in the United Kingdom. As such, petitioner is not eligible for benefits under the U.S.-U.K. tax treaties.

## IV. *Conclusion*

In sum, we find that petitioner received 50 percent royalties and 50 percent personal services income under the on-course endorsements. We also find that 50 percent of the royalty income petitioner received under the on-course endorsement agreements and the Rolex agreement is U.S.-source income, 92 percent of the royalty income petitioner received under the Upper Deck endorsement agreement is U.S.-source income and 70 percent of the royalty income received under the Electronic Arts agreement is U.S.-source income. Petitioner has not shown that he is eligible for any treaty benefits.

We have considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*