140 T.C. No. 6

UNITED STATES TAX COURT

SERGIO GARCIA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13649-10.                    Filed March 14, 2013.

P, a professional golfer and a resident of Switzerland, entered into an endorsement agreement with sponsor T.  P agreed to allow T to use his image, name, and voice (image rights) in advertising and marketing campaigns worldwide.  P also agreed to perform personal services for T including using T's products in all his golf play, posing and acting for advertisements, and making personal appearances for the company.  In return for his services and use of his image rights, T agreed to pay P certain compensation.

P and T allocated 85% of P's compensation to royalties (for use of his image rights) and 15% to personal services.  P established EP, LLC, in the State of Delaware, which would receive the royalty payments and then pay a portion of the royalty payments (attributable to use of the image rights in the United States) to a second LLC that P established in Switzerland, LD.  The result was that P paid no U.S. tax on the royalty payments, but did pay U.S. tax on the U.S. source personal service payments.

R now disputes the 85%-15% allocation between royalty and personal service payments, arguing for a larger portion attributable to P's personal services.  R also claims that we should find the U.S. source royalty payments were made directly to P and disregard the form of the transaction involving EP and LD.  R additionally claims that such royalty income (as well as all U.S. source personal service income) should be taxable to P in the United States and not exempted from U.S. taxation under the Convention between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income (Swiss Tax Treaty).

P claims that the 85%-15% allocation between royalty and personal service payments understated, if anything, the royalty allocation.  P disputes R's claims regarding the EP/LD transaction and further claims that even if that transaction is disregarded (and we consider the payments to have been made directly to P), all of P's royalty income, as well as a portion of his U.S. source personal service income, is exempt from tax in the United States under the Swiss Tax Treaty.

Held:  The payments made by T are allocated 65% to royalties and 35% to personal services.

Held, further, any royalty income to P is exempt from taxation in the United States under the Swiss Tax Treaty.  However, none of his U.S. source personal service income is exempt from taxation in the United States.

Thomas V. Linguanti, Jenny A. Austin, Jason D. Dimopoulos, Robert F. Hudson, Jr., and Robert H. Moore, for petitioner.

W. Robert Abramitis, Tracey B Leibowitz, and Karen J. Lapekas, for respondent.

GOEKE, Judge: Respondent determined deficiencies in petitioner's Federal income tax of $930,248 and $789,518 for tax years 2003 and 2004, respectively, as a result of income he purportedly received during those years through an endorsement agreement with TaylorMade Golf Co. (TaylorMade). After concessions, the issues for decision are:

(1) the extent to which payments made by TaylorMade under the endorsement agreement are compensation for the performance of petitioner's personal services and the extent to which the payments are royalties for the use of petitioner's image rights. We hold that the payments made by TaylorMade are allocated 65% to royalties and 35% to personal services;

(2) whether the U.S. source royalty compensation is income to petitioner or to Long Drive Sàrl, LLC (Long Drive). Because we hold that even if the U.S. source royalty compensation was income to petitioner, he is not taxable in the United States on any of this income, we need not address this issue.

(3) whether the U.S. source royalty compensation and a portion of the U.S. source personal service compensation are taxable to petitioner in the United States. We hold that no royalty compensation is taxable to petitioner in the United States, but that all U.S. source personal service compensation is taxable to petitioner in the United States.

FINDINGS OF FACT

At the time the petition was filed petitioner was a Spanish citizen residing in Switzerland.

1. Background

Petitioner is a professional golfer, having turned professional in 1999 after a highly successful amateur golf career. Since 1999 he has played golf around the world, on both the Professional Golfers' Association of America Tour (PGA Tour) and the European Tour. From 1999 to 2004 his world golf ranking was: 12th at the end of 1999; 16th at the end of 2000; 6th at the end of 2001; 4th at the end of 2002; 36th at the end of 2003; and 7th at the end of 2004.

Petitioner was born in Spain, and his skill at golf and dynamic character attributes have made him a fan favorite and a world-famous celebrity. Nicknamed "El Nino" in his early years as a professional, petitioner is notable for his charismatic and fiery personality which differentiates him from most others who play "the gentleman's game" for a living. Petitioner's personality and his athletic image have helped to make him one of the most marketable golfers in the world, even more marketable than many of those golfers who rank ahead of him or who

have won one of golf's four "Major" tournaments.[1]  Taken together, petitioner's personality, image, and golf skill make up his personal brand.

Since 2001 petitioner has been represented by IMG, a sports entertainment media company that finds and presents to him endorsement, appearance, and golf opportunities.  IMG also negotiates contracts on petitioner's behalf and helps to manage his relationships with his various sponsors.  However, petitioner makes the final decisions regarding what products he will endorse, what appearances he will make, and what golf events he will play in.  Over the years petitioner has entered into a variety of endorsement agreements for products used both on and off the golf course, including sunglasses, video games, watches, real estate resorts, and trading cards.  Sponsors value petitioner's endorsement because it allows their products to be associated with his popular personal brand.

2.  TaylorMade Endorsement Agreement and Performance

On October 8, 2002, petitioner entered into a seven-year endorsement agreement (commencing January 1, 2003, and ending December 31, 2009) with

---

[1]"The Majors" are the Masters, the U.S. Open, the British Open, and the PGA Championship.  Professional golfers are largely remembered for how they perform in these tournaments.  Although he has come close, petitioner has been unable to pull off a win in one of the Majors.

TaylorMade under which he would become a TaylorMade "Global Icon",[2] around whom TaylorMade would build its brand. At the time the endorsement agreement was signed TaylorMade had endorsements and/or use agreements with nearly 200 professional golfers, but petitioner was the only one who held the Global Icon title. Under the endorsement agreement petitioner would exclusively wear and use golf products produced by TaylorMade and associated brands (TaylorMade products), and TaylorMade would receive the right to use petitioner's image, likeness, signature, voice, and any other symbols associated with his identity to promote TaylorMade products. The associated brands were Adidas (which owned TaylorMade's parent company)[3] and Maxfli (which was acquired by TaylorMade at

[2]The endorsement agreement defined the term "Global Icon" as--

> a premiere golfer who consistently ranks among the world's best players and represents and symbolizes the finest attributes of the game and * * * [TaylorMade]. A person who connects emotionally with golfers in all regions of the world, and is synonymous with the core brand values of * * * [TaylorMade], and who becomes a * * * [TaylorMade] ambassador. The relationship between a Global Icon and the company is multi-faceted. Continued investment by the company to enhance the athlete's performance and develop his persona will maximize both parties' long-term investments in the relationship.

[3]While petitioner was the only golfer in the Adidas family identified as a Global Icon, Adidas identified certain other prominent sports figures as Global Icons, including David Beckham (soccer), Anna Kournikova (tennis), and Steffi

(continued...)

the end of 2002 and produced golf balls). The endorsement agreement was a "head to toe"[4] deal; products which petitioner was required to use included golf clubs, golf balls, golf gloves, golf bags, shoes, clothing, hats, and essentially any other golf product he would use in a professional event.

At the time TaylorMade signed petitioner to the endorsement agreement TaylorMade was seeking to redefine its brand as part of a larger strategy to focus the company on high-performance golf products. TaylorMade signed petitioner to the endorsement agreement because he would add a "cool", "athletic", and "competitive" element to the TaylorMade brand which would help them "appeal to competitive golfers, younger golfers, athletic golfers, and golfers that wanted to have a little bit of fun." As its only Global Icon, petitioner was the centerpiece of TaylorMade's marketing efforts; he featured prominently on TaylorMade's

---

[3](...continued)
Graf (tennis).

[4]In addition to so-called head to toe deals which also involved name and image rights, there are two other primary types of golf endorsement contracts. The most common type of endorsement contract (representing approximately 85-90% of all contracts) is a "wear and carry" contract, in which a golfer is paid to use specific products in one or many tournaments but does not give up his or her image rights. Less common than "wear and carry" contracts (but more common than "head to toe" contracts) are contracts for a golfer to use specific products and to grant a company the right to use the golfer's image rights to promote the products used.

worldwide Web site, in TaylorMade's TV and print advertisements, point-of-sale materials (such as racks holding golf clubs and balls at sporting goods stores), and other forms of advertising.

As previously discussed, under the endorsement agreement petitioner was obligated to exclusively use certain TaylorMade products, both on and off the golf course.[5] TaylorMade also received the right to "fully exploit the Endorsement" and to use petitioner's image rights in doing so (without making a royalty payment each time it used petitioner's image rights). Petition had certain other obligations, including: encouraging cross-promotion of TaylorMade products with his other corporate sponsors; playing in at least 20 professional golf events each year;[6] acting in a courteous and professional manner, including not breaking the law, using performance-enhancing drugs, or committing an act "violating public morality or decency"; completing at least 12 combined service and personal appearance days each year;[7] using "diligent efforts" to be available to test TaylorMade products; and

---

[5]Petitioner's caddy was also required to wear TaylorMade clothing, shoes, and headgear during professional events.

[6]Petitioner played in more than 20 events in both 2003 and 2004.

[7]During such days petitioner would shoot advertisements for TaylorMade and entertain customers and clients of TaylorMade (among other promotional activities).

generally supporting TaylorMade products and promoting goodwill toward the TaylorMade brand. There were many other minor obligations petitioner had under the endorsement agreement, such as using reasonable efforts to ensure his TaylorMade trademarks were visible.

Petitioner would incur various penalties for not fulfilling his obligations under the endorsement agreement. For example, had he failed to play in 20 professional golf events in a given year, his base remuneration (discussed further infra) would have been reduced pro rata. Failure to comply with his other obligations would possibly have resulted in (at TaylorMade's discretion) other financial penalties or termination of the endorsement agreement. However, there would be no penalty if TaylorMade failed to use the service or personal appearance days in any contract year.

TaylorMade also had various obligations under the endorsement agreement, most of which involved supplying petitioner with its products and paying him. Petitioner's base remuneration for years 2003 through 2005 was $7 million, after which time his base remuneration depended on his average world ranking at the end of the year, from a high of $9 million for a 1st place rank to a low of $3 million should he be ranked 21st or lower. Petitioner's base remuneration for years 2004 through 2009 could also be calculated under an alternative method (more favorable

to petitioner) if TaylorMade's products sold well during the years 2003 through 2009. He could also earn bonuses for each Major tournament he won while using the products which he was required to endorse.[8]

The original endorsement agreement did not specify the percentage of the remuneration attributable to petitioner's personal services and the percentage attributable to his image rights. TaylorMade had the option to renegotiate the endorsement agreement should petitioner fall to 40th place or lower in the world rankings at any time during the contract period. If TaylorMade opted to renegotiate and the parties could not come to an endorsement agreement after 30 days, TaylorMade had the option to terminate the endorsement agreement.

In March 2003 a dispute arose between petitioner and TaylorMade regarding the Maxfli brand of golf balls which petitioner was required to use. Petitioner believed the balls were not suitable for his use and returned to using a competitor's brand. At the time petitioner stopped using Maxfli balls TaylorMade had already spent several million dollars developing an advertising campaign for the Maxfli brand featuring petitioner. TaylorMade was forced to scuttle the portion of this campaign featuring petitioner as a result of his use of a competitor's ball

---

[8]Depending on the year and which TaylorMade products he did use, petitioner might forfeit some or all of the bonus remuneration should he fail to use some or all of the TaylorMade products which he was required to use.

because the advertising was no longer "authentic". The parties had difficulty resolving the dispute but eventually agreed to amend the endorsement agreement in certain ways.

The first amended endorsement agreement was executed on August 21, 2003. This amended endorsement agreement reduced petitioner's 2003 base remuneration to $4 million (from $7 million). It also reduced base remuneration (including petitioner's base pay under the alternative method involving TaylorMade sales, which remained at $7 million) by one-seventh for each later year in which petitioner failed to use a Maxfli ball for the entirety of the year in all golfing activities. The first amended endorsement agreement did not substantially change the bonus remuneration payments other than to add a penalty for not using a Maxfli ball should he win a Major tournament during 2003. The first amended endorsement agreement also added a provision regarding division of payments for use of petitioner's image rights and his personal services: 15% of remuneration (both base and bonus) would be paid to petitioner for his personal services and 85% of remuneration would be paid to Even Par, LLC (Even Par), which had been granted petitioner's image rights licensed by TaylorMade for use in the United States (discussed further infra). Finally, the first amended contract specified that petitioner would be available for two product-testing days each year of the

contract. On such days petitioner would use TaylorMade products and critique them.

Several months after the first amended contract was signed, petitioner was still not using a Maxfli ball,[9] and the parties agreed to amend the endorsement agreement a second time. In addition to the remuneration reductions in the first amended endorsement agreement, the second amended endorsement agreement: (1) reduced 2004 base remuneration to $4.5 million; (2) reduced 2005 base remuneration to approximately $5.5 million ($4.75 million if petitioner failed to use a Maxfli ball in all golfing activities during that year); (3) added an alternative base remuneration calculation for 2004 and 2005 should petitioner finish in the top 10 in the world golf rankings;[10] and (4) removed the provision of the endorsement agreement allowing TaylorMade to renegotiate (and potentially terminate) the endorsement agreement should petitioner finish in 40th place or lower in the world golf rankings.

---

[9]Petitioner continued to use a competitor's ball into 2004 but then returned to using a Maxfli ball.

[10]Base remuneration under this alternative computation method would be reduced by one-seventh should petitioner fail to use a Maxfli ball during all golfing activities during the specific year.

TaylorMade did not fully use petitioner's service or personal appearance days in either 2003 or 2004. It is unclear from the evidence and testimony exactly how many service, personal appearance, and product-testing days TaylorMade used each year. However, it appears that petitioner participated in a total of 10 service, personal appearance, and product-testing days in 2003 and a total of 9 such days in 2004. The personal appearances involved playing golf with TaylorMade clientele, attending certain company events (such as dinners), and visiting stores. These events took place in several countries, including Ireland, the United States, Japan, Spain, and Portugal.

3. Companies Related to Petitioner[11]

On May 22, 2003, Long Drive was incorporated in Switzerland and thereafter reached an endorsement agreement with Swiss authorities regarding the manner in which it would be taxed under Swiss law. Petitioner owned 99.5% of Long Drive, and the remaining 0.5% was owned by his financial adviser, Gonzalo Rodriguez-Fraile. Even Par was formed in Delaware on December 12, 2002. Petitioner owned 99.8% of Even Par, and the remaining 0.2% was owned by his father, Victoriano Garcia.

---

[11]The structure of the related companies is not pertinent to the ultimate decisions in this Opinion. This information is provided for background purposes.

Petitioner sold Long Drive his image rights licensed by TaylorMade for use in the United States under the endorsement agreement (U.S. licensed image rights). In return petitioner received a promissory note from Long Drive payable over seven years. Next, the U.S. licensed image rights were assigned by Long Drive to Even Par, which in return agreed to pay all amounts collected from TaylorMade in connection with those rights directly to Long Drive (which would then pay petitioner in satisfaction of the promissory note).[12] Because of the manner in which the Swiss authorities agreed to tax the payments made to Long Drive from Even Par, the structure created an advantageous system for petitioner; his U.S. royalty payments would not be taxed in the United States and would instead be taxed at lower rates under Swiss law (as per the endorsement agreement between the Swiss authorities and Long Drive).

As previously stated, the first amended endorsement agreement (but not the original) contained a provision assigning 85% of the payments to Even Par (for TaylorMade's use of petitioner's image rights, both within and outside the United States) and 15% to petitioner (for his personal services, both within and outside the

---

[12]Even Par also received payments for use of petitioner's image right used outside the United States and paid those amounts to a Netherlands company wholly owned by petitioner. The parties agree that remuneration for the non-U.S. image rights is not taxable in the United States and it need not be further addressed.

United States). TaylorMade made each payment under the endorsement agreement to IMG, which would take its expenses and then pay 85% of the remaining amount to Even Par and 15% to petitioner.

On each of his Forms 1040-NR, U.S. Nonresident Alien Income Tax Return, for 2003 and 2004 petitioner reported a portion of the personal service payments as his U.S. source income effectively connected with the conduct of a trade or business within the United States. He did not report any of the royalty payments made to Even Par. Even Par filed tax returns as a partnership, reporting only gross royalty income and matching royalty expenses (which it deducted from the gross royalty income, leaving no taxable income). Even Par's returns stated that the royalty payments were taxable only under Swiss law.

4. Other Information

On March 17, 2010, respondent issued a notice of deficiency to petitioner for 2003 and 2004 determining deficiencies of $930,248 and $789,518, respectively. Petitioner timely filed a petition contesting the deficiencies.

OPINION

I.  Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are incorrect.  Rule 142(a);[13] Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they have met all requirements necessary to be entitled to the claimed deductions.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The parties agree that respondent bears the burden of proof on certain issues raised in an amendment to respondent's answer.  However, because we decide all issues on the basis of the preponderance of the evidence, we need not address the burden of proof further. See Knudsen v. Commissioner, 131 T.C. 185 (2008).

II.  Allocation of TaylorMade Payments--Personal Services and Royalties

A.  Stipulated Issues, General Arguments, Allocation in First Amended Endorsement agreement, and Expert Reports

The parties have stipulated that during 2003, 69% of petitioner's personal service income was derived from sources within the United States and the remaining 31% was derived from sources outside the United States.  The parties have also

---

[13]All Rule references are to the Tax Court Rules of Practice and Procedure.

stipulated that during 2004, 68% of petitioner's personal service income was derived from sources within the United States and the remaining 32% was derived from sources outside the United States.  Finally, the parties have stipulated that any portion of the TaylorMade payments which we determine to be royalties paid for the use of petitioner's image rights shall be treated as 50% U.S. source income and 50% foreign source income.

In his notice of deficiency respondent took the position that all payments made by TaylorMade under the endorsement agreement were compensation for petitioner's personal services.  Respondent has since abandoned that position and instead argues that "The vast majority of the remuneration * * * is attributable to the personal services Petitioner rendered to Taylor Made."  Petitioner claims that the first amended endorsement agreement's 85%-15% allocation between royalty and personal service payments, if anything, understated the royalty allocation.

One of petitioner's arguments is that we should respect the 85%-15% allocation in the first amended endorsement agreement as the product of an arm's-length negotiation between two unrelated parties with adverse tax interests.  See O'Dell & Co. v. Commissioner, 61 T.C. 461, 468 (1974); Bemidji Distrib. Co. v. Commissioner, T.C. Memo. 2001-260, 2001 Tax Ct. Memo LEXIS 295, at *18 ("adverse tax interests deter allocations which lack economic reality"), aff'd sub

nom. <u>Langdon v. Commissioner</u>, 59 Fed. Appx. 168 (8th Cir. 2003). Petitioner claims that he and TaylorMade had adverse tax interests because he wished to have a higher percentage of his pay consist of royalties (on which he would pay taxes only in Switzerland), and TaylorMade wished to satisfy its legal withholding requirements and not damage its reputation by using an allocation which was indefensible. However, TaylorMade's CEO testified that "it was irrelevant to me whether it was 85/15 or 50/50." Similarly, TaylorMade's outside counsel testified that petitioner's team took the lead on the allocation issue and that TaylorMade did not put "a whole lot of effort" into it. In addition, after reviewing the facts of this case, we conclude that the 85%-15% allocation does not comport with the economic reality of the endorsement agreement (discussed further <u>infra</u>). As a result, we will not adopt the 85%-15% allocation stated in the first amended endorsement agreement.

The parties have introduced four expert reports (one from respondent, three from petitioner) regarding the allocation issue. Respondent's expert witness, Mark Roesler, found that under the general industry standard, personal services are more valuable than use of image rights. Considering various factors, he concluded that a majority of the payments were attributable to petitioner's personal services. Two of petitioner's expert witnesses made general conclusions, based on the facts of the

case, that TaylorMade entered into the endorsement agreement with petitioner primarily for use of his image rights. Petitioner's third expert witness, Rodney Fort, examined other endorsement contracts involving petitioner, determined the value of petitioner's service days/personal appearances using both the mean ($50,561) and median ($33,333) values of the other contracts, and determined the value of the "wear-and-carry" portion of the endorsement agreement to be $150,000 per year.[14] He then subtracted these various values from the original $7 million base remuneration for 2003 and 2004 to determine a range of values for the image rights. In percentage terms, Mr. Fort allocated 89% to 96% of the 2003 payments to royalties and 83% to 92% of the 2004 payments to royalties, with the remainder for each year allocated to personal services.

Although we appreciate their attempts to analyze a difficult valuation problem, we do not agree with Mr. Roesler's or Mr. Fort's ultimate conclusions regarding allocation to personal services and royalties. We have considered the analysis in each expert report and find those analyses to be helpful in reaching our holding.

---

[14]Mr. Fort assigned no value to petitioner's product testing or other provisions of the endorsement agreement.

B.  Discussion of Facts and Law

"Courts have repeatedly characterized payments for the right to use a person's name and likeness as royalties because the person has an ownership interest in the right."  Goosen v. Commissioner, 136 T.C. 547, 559 (2011) (citing Cepeda v. Swift & Co., 415 F.2d 1205 (8th Cir. 1969), Haelan Lab., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir. 1953), Boulez v. Commissioner, 83 T.C. 584 (1984), Kramer v. Commissioner, 80 T.C. 768 (1983), and Uhlaender v. Henricksen, 316 F. Supp. 1277 (D. Minn. 1970)).  In Goosen v. Commissioner, 136 T.C. at 560, we further stated that--

> The characterization of * * * [a taxpayer's] endorsement fees and bonuses depends on whether the sponsors primarily paid for * * * [the taxpayer's] services, for the use of * * * [the taxpayer's] name and likeness, or for both.  We must divine the intent of the sponsors and of * * * [the taxpayer] from the entire record, including the terms of the specific endorsement agreement.  [Citations omitted.]

The facts of this case are well established.  Under the endorsement agreement petitioner would receive compensation for performing certain personal services and also for allowing TaylorMade to use his image rights to sell products.  Petitioner became TaylorMade's only Global Icon, and his name and/or likeness were prominently featured in TaylorMade's advertisements around the world.

Multiple witnesses, familiar with the sports advertising industry as a whole and with the practices of TaylorMade specifically, have clearly and credibly testified that both the use of petitioner's image rights and the personal services petitioner provided (especially his use of the TaylorMade products while playing in professional golf events) were crucial elements of petitioner's endorsement agreement. For example, TaylorMade's chief marketing director, Robert Maggiore, testified that under the endorsement agreement TaylorMade received petitioner's "brand and image and license. He then wears and plays our products, and then we tell the story about all the equipment he has in play. So if you pull one of those pieces out, like the house of cards kind of falls."

We concur with the testimony of Mr. Maggiore and other witnesses that both the use of petitioner's image rights and the personal services he provided were critical elements of the endorsement agreement. However, it does not directly follow that a 50-50 allocation between royalty and personal service compensation is called for simply because both elements were critical.

We have previously decided cases involving sports stars where allocation of payments for personal services and royalties was at issue. In Kramer v. Commissioner, 80 T.C. 768, involving an endorsement agreement between a retired tennis champion and Wilson Sporting Goods Co. during 1975 and 1976, we

allocated 70% of payments to royalties and 30% of payments to personal services. However, given the somewhat different facts of that case, combined with its age,[15] we do not give much weight to the 70%-30% allocation reached. In addition, we have a recent case involving a factual situation much more similar to petitioner's which makes for a better comparison.

Goosen v. Commissioner, 136 T.C. 547, involved a prominent professional golfer, Retief Goosen, under a contract with TaylorMade during the years 2002 and 2003 to endorse and use certain TaylorMade products and allow TaylorMade to use his image rights to market those products. Unlike petitioner, Mr. Goosen was not a TaylorMade Global Icon and was not signed to a "head to toe" contract with TaylorMade. Rather, Mr. Goosen was identified as a TaylorMade "brand ambassador" who was required only to use and endorse TaylorMade clothing, headgear, golf clubs, golf club head covers, and golf bags. Mr. Goosen also had to complete eight total service and personal appearance days annually for TaylorMade, as well as an unstated amount of product testing. In addition, Mr. Goosen was required to play in "a minimum of 20 PGA Tour tournaments and 11 European Tour tournaments per year" or his endorsement fees would be prorated. Id. at 553. Mr.

---

[15]Certain evidence and testimony indicated that the sports endorsement business is one which changes rapidly.

Goosen was paid a $400,000 annual endorsement fee by TaylorMade, with bonuses available should he attain a higher world golf ranking or win specified tournaments.

In addition to his TaylorMade endorsement agreement, Mr. Goosen had an endorsement agreement with Acushnet Co. (Acushnet) to use Titleist golf balls and golf gloves which paid him $350,000 and $375,000 in the two years at issue. Mr. Goosen also had an endorsement agreement with Izod Club (Izod) to wear certain clothing while playing golf,[16] which paid him approximately $35,000 annually. Under these two endorsement agreements Mr. Goosen agreed to complete a total of six service and personal appearance days annually, as well as to do product testing for Acushnet.

Considering the specific facts of Goosen, we held that a 50-50 split between royalty and personal service payments was appropriate for Mr. Goosen's TaylorMade endorsement agreement (as well as his Acushnet and Izod endorsement agreements). In doing so, we "highlighted the contrast between TaylorMade's on-course endorsements with" Mr. Goosen and petitioner's TaylorMade endorsement agreement. Id. at 561-562. We noted that Mr. Goosen--

---

[16]It appears Mr. Goosen was able to comply with the clothing requirements of his TaylorMade endorsement agreement even though he was also required to wear certain Izod clothing.

ranked either near or higher than Mr. Garcia on the PGA Tour and World Golf Rankings during the years at issue. * * * [Mr. Goosen] had won a Major Championship as well as several high-profile tournaments on the European Tour. In contrast, Mr. Garcia had failed to win a Major Championship and had few significant wins. Despite this difference in golf performance, both * * * [Mr. Goosen] and Mr. Garcia entered into substantially similar endorsement agreements with TaylorMade. In addition, Mr. Garcia was paid substantially more than * * * [Mr. Goosen] despite his lesser record. TaylorMade valued Mr. Garcia's flash, looks and maverick personality more than * * * [Mr. Goosen's] cool, "Iceman" demeanor. We find that TaylorMade, Izod and Acushnet valued * * * [Mr. Goosen's] image, and they paid substantial money for the right to use his name and likeness. [Id.]

Considering the facts and prior caselaw, we do not believe a 50-50 split between royalty and personal service payments is appropriate in petitioner's case. Petitioner was TaylorMade's only Global Icon during the years at issue; he was the centerpiece of TaylorMade's marketing efforts and the golfer around whom TaylorMade sought to build its brand. The same cannot be said of Mr. Goosen. We find that petitioner's status as a TaylorMade Global Icon, especially the extent to which Taylor Made used his image rights to sell its products, is strong evidence that his TaylorMade endorsement agreement was more heavily weighted toward image rights than Mr. Goosen's.

Respondent argues that petitioner was paid more than Mr. Goosen primarily because petitioner's TaylorMade endorsement agreement required more personal

services than Mr. Goosen's and "Petitioner's charisma and playing style * * * increased the value of his services." We agree with respondent that petitioner's personal services are worth more than Mr. Goosen's, all else being equal. However, we are not convinced that petitioner's TaylorMade endorsement agreement required more personal services than Mr. Goosen's, especially when one considers the relative values of different personal services.

Many of the personal service requirements of petitioner's and Mr. Goosen's TaylorMade endorsement agreements are similar. For example, both had a responsibility to endorse the required products and both had clauses in their endorsement agreements allowing TaylorMade to fire them should they act in an immoral or illegal manner. There were some notable differences, however.

Petitioner was required to complete a total of 12 service and personal appearance days each year for TaylorMade, while Mr. Goosen was required to complete only 8. However, Mr. Goosen's TaylorMade agreement was not a "head to toe" deal, and he was required to complete six additional service and personal appearance days for Acushnet and Izod. It thus appears that Mr. Goosen was required to perform more service and personal appearance days per endorsed product than petitioner. In addition, the testimony and other evidence show that service and personal appearance days did not constitute a large portion of the value

of petitioner's personal services; TaylorMade did not fully use the 12 service and personal appearance days in either 2003 or 2004 (using 10 or fewer each year),[17] and TaylorMade's CEO, Mark King, testified that any personal appearances petitioner made were "gravy" to TaylorMade. Considering these facts, we find the fact that petitioner's TaylorMade endorsement agreement required him to complete more service and personal appearance days than Mr. Goosen is of nominal importance.

TaylorMade required Mr. Goosen to play in more professional golf events while using endorsed products each year (31) than it required petitioner to play in (20). We believe that petitioner's use of endorsed products during his professional play was by far the most valuable personal service he provided to TaylorMade; his pay was reduced by millions of dollars when he chose not to play a Maxfli golf ball, TaylorMade used shots of petitioner using its products during professional events in its ads, and multiple witnesses testified to the great importance of petitioner's use of TaylorMade products while playing.[18] Respondent agrees that "Petitioner's

---

[17]It was not established how many service days and personal appearances Mr. Goosen actually completed for TaylorMade.

[18]In addition, as discussed supra and infra, other testimony and other evidence reflected that TaylorMade did not place a great deal of value on petitioner's service and personal appearance days or on his product testing.

performance for Taylor Made on the PGA and European golf tours" was of "predominant importance to the parties." Given the facts regarding the high value of petitioner's play while using TaylorMade products, we find the significantly lower number of professional events TaylorMade required petitioner to play in compared to Mr. Goosen is strong evidence that his TaylorMade endorsement agreement was less proportionately weighted toward personal services than Mr. Goosen's.

Petitioner was required to complete two product-testing days for TaylorMade each year, but it is unclear how many such days Mr. Goosen was required to complete for the lesser number of TaylorMade products which he endorsed. In addition, Mr. King gave testimony indicating that petitioner's product-testing days (even if they did have some value to TaylorMade) were of little importance in comparison with other personal services.[19] As a result, we find any differences in required product-testing days between petitioner's and Mr. Goosen's TaylorMade endorsement agreements were not of great significance.

---

[19]Specifically, Mr. King testified that TaylorMade "probably [did] not" listen to petitioner's product recommendations and that the fact petitioner tested TaylorMade products "certainly * * * [wasn't] a primary message" of TaylorMade's advertising, if it was mentioned at all.

Respondent has cited other personal services not required of Mr. Goosen which were required of petitioner as a TaylorMade Global Icon. Such personal services include "embod[ying] what * * * [TaylorMade] is trying to portray to the marketplace and to the consumers", playing golf "with style and charisma", and representing TaylorMade's values even when petitioner is "walking down the street". However, these are amorphous concepts, and we find they are of negligible importance compared to the other personal services required under the endorsement agreement. We also find that certain other requirements of petitioner (such as the requirement that he encourage cross-promotion of TaylorMade with other brands he endorsed), to be similarly negligible in comparison with the other personal service requirements.

C. <u>Conclusion Regarding the Allocation Issue</u>

We have previously recognized that precision in making an allocation between royalty and personal service payments "is unattainable, [but that] we must do the best we can with the evidence presented." <u>Goosen v. Commissioner</u>, 136 T.C. at 562 (citing <u>Kramer v. Commissioner</u>, 80 T.C. 768, <u>DeMink v. United States</u>, 448 F.2d 867, 870 (9th Cir. 1971), <u>Commissioner v. Ferrer</u>, 304 F.2d 125, 135 (2d Cir. 1962), <u>rev'g</u> 35 T.C. 617 (1961), and <u>Ditmars v. Commissioner</u>, 302 F.2d 481, 488 (2d Cir. 1962), <u>rev'g</u> T.C. Memo. 1961-105). Considering all the surrounding

facts and circumstances, we find that 65% of the endorsement fees petitioner received represented royalty compensation and 35% represented personal service compensation.

III. Effect of Swiss Tax Treaty

The parties agree that petitioner is a resident of Switzerland and that the Convention for the Avoidance of Double Taxation With Respect to Taxes on Income, U.S.-Switz., Oct. 2, 1996, Tax Treaties (CCH) para. 9101.001 (Swiss Tax Treaty) applies to him. However, the parties disagree on what portion of petitioner's TaylorMade endorsement income is taxable to him in the United States under that treaty. Petitioner argues that only the personal service income attributable to his wearing TaylorMade products while playing golf is taxable in the United States and that the royalty income as well as the personal service income attributable to his other personal services is taxable only in Switzerland. Respondent contends that all income at issue is taxable in the United States.

Petitioner also notes that respondent may not have properly raised the issue of "How the U.S.-Swiss Treaty Applies to Income Garcia Earns From TaylorMade." However, we find respondent adequately raised the issue regarding application of Article 17, Artistes and Sportsmen, of the Swiss Tax Treaty to petitioner's royalty payments in his second amended answer when he stated that "Any U.S.-source

royalties paid under the * * * [endorsement agreement] were paid for Petitioner's personal activities in the U.S. as a sportsman within the meaning of Article 17(1) of the Swiss Treaty."

A.  Royalty Income

Respondent argues that the compensation for use of petitioner's U.S. image rights is income to petitioner rather than to Long Drive because petitioner's endorsement agreement with Long Drive under which petitioner sold Long Drive his U.S. image rights licensed by TaylorMade was an impermissible assignment of income.  Respondent also argues that petitioner's endorsement agreement with Long Drive lacks economic substance.  Respondent claims that we should deem the image right payments to have been made to petitioner directly and then further argues that that income is taxable in the United States under the Swiss Tax Treaty.  Because we find that even if the image right payments were income to petitioner (rather than Long Drive) they are not taxable in the United States under the Swiss Tax Treaty, we need not address respondent's arguments regarding assignment of income or economic substance.

Article 12(1) of the Swiss Tax Treaty, Tax Treaties (CCH)  para. 9101.12, at 185,019,  provides that "Royalties derived and beneficially owned by a resident of a

Contracting State shall be taxable only in that State." Article 12(2) provides

that--

> The term "royalties" as used in this Convention means payments of any kind received as a consideration for the use of, or the right to use, any copyright of literary, artistic, or scientific work (but not including motion pictures, or films, tapes or other means of reproduction for use in radio or television broadcasting), any patent, trademark, design or model, plan, secret formula or process, or other like right or property, or for information concerning industrial, commercial, or scientific experience. <u>The term "royalties" also includes gains derived from the alienation of any such right or property which are contingent on the productivity, use, or disposition thereof</u>. [<u>Id.</u>; emphasis supplied.]

Petitioner argues that the payments he received from TaylorMade for use of his image rights are royalties as defined by article 12(2) and are therefore taxable only in Switzerland under article 12(1).

Respondent disagrees with petitioner that article 12 governs the taxability of the image right payments. Instead, respondent contends that those payments are governed by Article 17, Artistes and Sportsmen. Article 17(1) provides that "income derived by a resident of a Contracting State as an entertainer, such as a theatre, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State may be taxed in that other State."

In support of his argument, respondent cites the Department of the Treasury Technical Explanation of the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation With Respect to Taxes on Income  (Oct. 2, 1996), Tax Treaties (CCH) para. 9145 (Treasury Technical Explanation).  Petitioner agrees with respondent that the Treasury Technical Explanation is useful in interpreting the Swiss Tax Treaty, and we concur.  See  Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); see also N.W. Life Assur. Co. of Can. v. Commissioner, 107 T.C. 363, 385 (1996) (finding the Treasury Technical Explanation to another tax treaty to be "persuasive").  Regarding article 17, the Treasury Technical Explanation, Tax Treaties (CCH) para. 9145, at 185,242, states that "In determining whether income falls under Article 17 or another article, the controlling factor will be whether the income in question is predominantly attributable to the performance itself or other activities or property rights." (Emphasis supplied.)  It further states that--

> Article 17 applies to all income connected with a performance by an
> entertainer, such as appearance fees, award or prize money, and a
> share of the gate receipts.  Income derived from a Contracting State by

a performer who is a resident of the other Contracting State from other than actual performance, such as royalties from record sales and payments for product endorsements, is not covered by this Article, but by other articles of the Convention, as appropriate, such as Article 12 (Royalties) * * *. For example, if an entertainer receives royalty income from the sale of live recordings, the royalty income would be exempt from source country tax under Article 12, even if the performance was conducted in the source country, although he could be taxed in the source country with respect to income from the performance itself under * * * [Article 17]. [Id.; emphasis supplied.]

The parties agree that the Treasury Technical Explanation does not define the term "predominantly attributable". Both parties have made arguments regarding how we should interpret that phrase, but we need not delve into them because we find the example involving a sale of live recordings to be highly illustrative of the intent of the Swiss Tax Treaty. Even given the relationship between a live performance and a recording of that performance, the Treasury Technical Explanation states that proceeds from the sale of such a recording may be royalties not taxable in the source country under article 12. In a similar vein, we believe that even though petitioner's golf play and personal services performed in the United States has some connection to his U.S. image rights,[20] income from the sale of such

_____

[20]Similar to the Treasury Technical Explanation example, images of petitioner playing in professional golf events or posing/acting in TaylorMade shoots were used in TaylorMade advertisements.

image rights is not predominantly attributable to his performance in the United States. Rather, the image rights are a separate intangible that generated royalties (as defined by article 12(2)) for petitioner when TaylorMade paid him for their use.

We thus find that the income petitioner received from TaylorMade for use of his U.S. image rights was royalty income not taxable in the United States under article 12(1).

B. Personal Service Income for Services Other Than Wearing TaylorMade Products While Golfing

In the first amended endorsement agreement, petitioner and TaylorMade allocated 85% of payments to royalties and 15% to personal services. On his 2003 and 2004 tax returns petitioner included 100% of his U.S. source personal service income under the endorsement agreement in his U.S. taxable income. Petitioner did not raise in the petition the issue that he may have included too much of his personal service income in his U.S. taxable income.

Neither party raised any argument regarding the Swiss Tax Treaty until nearly a year and a half after the petition was filed. Respondent first raised issues regarding the Swiss Tax Treaty, but contended only that (1) petitioner was not a Swiss resident to whom the treaty applied, and (2) if the treaty did apply to petitioner, then amounts paid to petitioner for use of his U.S. image rights were

taxable in the United States under article 17 of the treaty. Respondent later conceded that his first argument was incorrect and that petitioner was a Swiss resident to whom the treaty applied.

Neither before or during trial did either party raise the possibility that petitioner's personal service income for services other than wearing TaylorMade products while golfing might not be taxable in the United States under the Swiss Tax Treaty. In fact, petitioner's pretrial memorandum concedes that "Garcia was subject to tax in the U.S. on his U.S.-source personal service income under either U.S. federal income tax law or under Article 17 of the U.S.-Swiss Tax Treaty."[21] Petitioner's counsel also stated at trial that petitioner would "pay the same amount of U.S. tax on all of his personal services income" whether or not respondent's assignment of income and economic substance arguments regarding Long Drive prevailed. He further stated that petitioner "will pay and does pay the full amount of U.S. tax on any tournament winnings or prize money or other service income he receives from the United States" and that "Even if the Court were to find that more

_____

[21]The pretrial memorandum further states that "because Garcia was subject to and paid U.S. taxes on his U.S.-source personal service income (from TaylorMade and otherwise), his U.S.-source personal service income was exempt from Swiss income tax pursuant to Swiss domestic and treaty law."

of the income should be allocated to personal services * * * [petitioner] will pay the full U.S. tax on that" income.

In his posttrial opening brief petitioner for the first time raised the issue that a portion of his U.S. source personal service income might not be taxable in the United States.  Respondent did not address the issue in his posttrial opening brief but noted in his reply brief that petitioner had previously conceded that all U.S. source personal service income was taxable in the United States.

We agree with respondent that petitioner previously conceded the issue.  By raising the issue when and in the manner he did, petitioner prejudiced respondent in that respondent was unable to introduce testimony and/or other evidence that could have supported his position that all U.S. source personal service income was taxable in the United States.  Respondent was also unable to introduce testimony  and/or other evidence regarding the allocation of U.S. source personal service income attributable to petitioner's wearing TaylorMade products while playing golf  (which petitioner concedes is taxable in the United States) and other U.S. source personal service income (which petitioner now claims is not taxable in the United States). We find that petitioner raised the issue too late, and we will not consider it.  See DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), aff'd, 959 F.2d 16 (2d Cir.

1992). As a result, petitioner is liable for U.S. tax on all U.S. source personal service income he received.

IV. Conclusion

We hold that the compensation paid by TaylorMade under the endorsement agreement is allocated 65% to royalties and 35% to personal services. We further hold that none of the royalty compensation is taxable to petitioner in the United States but that all of the U.S. source personal service compensation is taxable to petitioner in the United States.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.